Muthu SUNDARAM, Plaintiff,

v.

BROOKHAVEN NATIONAL LABORATORIES, et al., Defendants.

No. 94 CV 2330 NG VVP.

United States District Court, E.D. New York.

March 29, 2006.

Muthu S. Sundaram, Parlin, NJ, pro se.

David B. Ross, Seyfarth, Shaw, Fairweather & Geraldson, Devjani Mishra, Seyfarth Shaaw, New York, NY, for Defendants.

## ORDER

GERSHON, United States District Judge.

In a sixty-five page report and recommendation ("R & R") dated January 19, 2006, Magistrate Judge Viktor V. Pohorelsky recommends that judgment be granted in favor of defendants. Specifically, Judge Pohorelsky recommends that the plaintiff's motion for partial summary judgment be denied; that the defendants' motion for summary judgment dismissing the complaint be granted; that the plaintiff's motion to strike portions of the record be denied in part and dismissed as moot in part; and that the defendants' motion to strike portions of the record be granted in part and denied in part. The *pro se* plaintiff has filed objections, which have been reviewed *de novo* pursuant to Rule 72(b) of the Federal Rules of Civil Procedure. To begin with, plaintiff claims that Judge Pohorelsky did not rule on his motion for summary judgment and that the motions to strike were not within his referral jurisdiction. Both claims are clearly incorrect.

Judge Pohorelsky's R & R exhaustively examines each of the claims raised by the plaintiff. For example, in an impeccable and detailed analysis, which plaintiff does not refute, he concludes that many of the claims are either time-barred or that the court has no jurisdiction over them. The court adopts Judge Pohorelsky's analyses and conclusions at to these issues. The court also adopts Judge Pohorelsky's conclusion that the federal enclave doctrine bars plaintiff's state law claims of discrimination and breach of implied contract. Plaintiff's argument that the R & R, in this respect, rests on Judge Pohorelsky's "personal opinion" (Objections at p. 27) is simply wrong. Judge Pohorelsky's conclusion that Brookhaven National Laboratories is a federal enclave and that plaintiff's claims are barred is fully supported by the law and the indisputable facts. See *Schiappa, Sr. v. Brookhaven Science Associates, LLC*, 403 F.Supp.2d 230, 236–38 (E.D.N.Y. 2005).

With respect to whether summary judgment is appropriate on plaintiff's remaining Title VII and ADEA claims and state discrimination claim, Judge Pohorelsky has generously read plaintiff's claims, accurately described the applicable law and applied it with care and sensitivity to plaintiffs' *pro se* status (even though plaintiff is law-trained). Judge Pohorelsky's conclusions that plaintiff has either failed to establish an inference of discrimination sufficient to make a *prima facie* case or that no reasonable juror could conclude, on the basis of all of the facts, that he was discriminated against, or retaliated against, on the basis of his race, color, national origin or age are fully supported and plaintiff's objections are without merit. Judge Pohorelsky addressed all of the underlying factual issues, including whether plaintiff had provided sufficient evidence of proper comparators. Plaintiff's complaints about the R & R either mischaracterize the R & R or are simply not supported in the evidence.

Finally, the R & R correctly rejects plaintiff's claims under ERISA and state claims of breach of the covenant of fair dealing and fraud.

In sum, the R & R is adopted in its entirety and the Clerk of Court is directed to enter judgment for the defendants dismissing this action.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

VIKTOR V. POHORELSKY, United States Magistrate Judge.

Both the plaintiff Dr. Muthu Sundaram and the defendants—Brookhaven National Laboratory, Associated Universities, Inc., Dr. Leon Petrakis and Meyer Steinberg— have made motions for summary judgment in this employment discrimination case. As an adjunct to these motions, the plaintiff and the defendants have each moved to strike a portion of the record submitted by the other in support of their respective positions on the motions. These motions have been referred to me by Judge Gershon for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). As detailed below, I recommend that (1) the plaintiff's motion for summary judgment be denied, (2) the defendant's motion for summary judgment be granted, (3) the plaintiff's motion to strike portions of the record be denied in part and dismissed in part as moot, and (4) the defendants' motion to strike portions of the record be granted in part and denied in part.

## I. FACTS

The following facts are not in dispute unless otherwise indicated.[1] Dr. Sundaram's claims here arise from his extended employment as a research scientist at the Brookhaven National Laboratory, a research laboratory owned by the United States Department of Energy ("DOE") and operated by Associated Universities, Inc. under a contract with DOE. Def. LR 56.1 Stmt ¶ 5. When the plaintiff's employment commenced on September 1, 1981, he was placed on the Scientific Staff in a tenure track position where he served for seven years under a series of term appointments ranging in duration from one to two years. *Id.* ¶¶ 36–41. In 1988, after he failed to receive tenure, the plaintiff was placed on the Professional Staff, *id.* ¶ 47, where he continued his employment for three more years until September 30, 1991 under a variety of arrangements. *Id.* ¶¶ 48, 51, 54, 63, 64, 74, 80, 84, 94, 101, 103, 106. The last arrangement was a term appointment for a period of one year running from October 1, 1990 through September 30, 1991.[2] *Id.* ¶¶ 106, 108.

Throughout his ten years at Brookhaven, the plaintiff worked as a coal chemist in the Department of Applied Science ("DAS"). *Id.* ¶¶ 3, 36–37, 50. Funding for the work done by that department, as well as for most of the laboratory's operations, came primarily from the DOE in the form of grants for specific research programs authorized by the DOE. *Id.* ¶¶ 21–28. In the late 1980's, government funding for research at the laboratory declined significantly, such that the Process Science Group of the DAS, the group to which the plaintiff was assigned during most of his employment at the laboratory, experienced

1. The facts are distilled from the extensive submissions made by the parties. An appendix that follows this opinion lists the various papers submitted in connection with the motions, as well as the short form by which the papers cited in this opinion are referenced.

2. The plaintiff vigorously objects to the characterization of the last year of his employment as a "term appointment," arguing that there is no provision in the employee handbook for term appointments for professional staff, only for scientific staff. A memorandum setting forth the plaintiff's employment arrangement for that year specifically states, however, that the plaintiff was being given "a term appointment for one year and will be subject to renewal upon sufficient funding . . ." Sundaram Dep. Ex. 24 (found in Def. Appx Vol. I, Ex. B). The memorandum was countersigned by the plaintiff indicating his acceptance of the terms of employment. In view of that undisputed evidence, no reasonable jury could find that the plaintiff's employment was not a "term appointment for one year."

a decline in its budget from $2.2 million in 1986 to $660,000 in 1990. *Id.* ¶¶ 56, 58.[3] The Chairman of the DAS at that time, Dr. Petrakis, reorganized the department in early 1990 and reassigned the plaintiff to the Applied Physics Division headed by Dr. Kelvin Lynn. *Id.* ¶¶ 56, 64. Although the plaintiff disputes whether lack of funding was the real reason his employment was ultimately terminated, he does not dispute that funding for his new position in the Applied Physics Division was in short supply. Sundaram Dep. 190; Sundaram Dep. Exs. 19, 20.[4] Thus in mid-May 1990, the plaintiff received a four and one-half month appointment on the understanding that the plaintiff's employment would terminate on September 30, 1990 unless sufficient full-time funding support for him was provided by DOE. Def. LR 56.1 Stmt ¶ 80; Sundaram Dep. Ex. 20 (found in Def. Appx Vol. I, Ex. B). When no such support materialized, Petrakis advised the plaintiff in late September 1990 that his employment would terminate at the agreed upon date. Def. LR 56.1 Stmt ¶¶ 92–94.

Shortly before termination, however, the plaintiff's former supervisor, Meyer Steinberg, proposed that the plaintiff be reassigned to work under him on the Mild Gasification program to which the plaintiff had been assigned for much of his career. *Id.* ¶ 95. That proposal was accepted by the laboratory and funding for his position

was obtained by canceling a technician's position on the program. *Id.* ¶¶ 99–101, 111. The plaintiff thus received a final one-year appointment from October 1, 1990 through September 30, 1991. *Id.* ¶ 106. At the conclusion of that appointment, the plaintiff's employment at the laboratory ended when funding for the Mild Gasification program was terminated by the DOE. *Id.* ¶¶ 119–120, 135. As a result of that loss of funding the entire Process Science Group to which the plaintiff had been assigned was dissolved. *Id.* ¶ 136.

The plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 21, 1992. Holland Aff. ¶ 1; Sundaram Dep. Ex. 29. On January 27, 1994, the EEOC mailed a Notice of Right to Sue to the plaintiff. Holland Aff. ¶ 5. The plaintiff then commenced the instant action on May 12, 1994. He thereafter filed a Verified Amended Complaint in October 1994 and a Verified Second Amended Complaint (hereinafter the "complaint") in January 1995.

The plaintiff's complaint states ten claims for relief, a number of which have been withdrawn by stipulation.[5] In the claims that remain, broadly stated, plaintiff alleges that the defendants discriminated against him on the basis of race,

---

**3.** Although the plaintiff vigorously disputes these statements of fact, he offers no evidence to rebut them. Rather he points to irrelevant facts concerning how other employees were funded, how funds were distributed, and facts unrelated to funding.

**4.** The term "Dep." throughout this opinion refers to the deposition of the witness whose name precedes the term, and the term "Dep. Ex." refers to exhibits introduced during the deposition. Excerpts from the deposition of Dr. Sundaram, the plaintiff, are annexed as Exhibit A in Def. Appx Vol. I; exhibits introduced at his deposition are annexed as Exhib-

it B. Other deposition transcripts and exhibits may be found in Def. Appx Vol. II and Pl. Attach. 3, 4, and 6.

**5.** As to all defendants, the plaintiff withdrew his claim under 18 U.S.C. § 1985, his RICO claim, his claims for violations of his constitutional rights, his claims for breach of fiduciary duties and public policies, his claim for negligent infliction of emotional distress, and his claim for defamation. As to the individual defendants, the plaintiff withdrew his ADEA and Title VII claims. The stipulation was entered on September 14, 1999.

color, national origin and age in making various employment decisions, including his termination, in violation of section 1981 (42 U.S.C. § 1981), Title VII (42 U.S.C. §§ 2000e *et seq.*), the Age Discrimination in Employment Act (29 U.S.C. §§ 621 *et seq.*) (hereinafter the "ADEA"), and state law (N.Y. Exec. Law § 297; N.Y. Civ R. Law § 40–c). He further claims that the defendants retaliated against him in violation of Title VII. The plaintiff also asserts an ERISA claim (29 U.S.C. § 1140) and state common law claims for breach of an implied contract, breach of the covenant of good faith and fair dealing, and intentional tort. Finally, the complaint also asserts that false and fraudulent misrepresentations were made to the plaintiff which may be construed as a common law fraud claim.

## II. DEFENDANTS' SUMMARY JUDGMENT MOTION

The defendants' motion for summary judgment attacks the plaintiffs' claims on a variety of fronts, including the statutes of limitations, the absence of jurisdiction for certain claims, and the legal and factual insufficiency of most of the claims. Those lines of argument necessary for a determination of the defendants' motion are considered below.

## A. SUMMARY JUDGMENT STANDARDS

A motion for summary judgment will be granted when there is no material issue of fact to be decided and the undisputed facts warrant judgment for the moving party as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Institute for Shipboard Educ. v. Cigna Worldwide Inc. Co.,* 22 F.3d 414, 418 (2nd Cir.1994). If a

reasonable jury could return a verdict for the non-movant, then a material issue of fact remains in contention and the motion must be denied. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The materiality of the facts is determined by the substantive law governing the claims. *Id.* at 248, 106 S.Ct. 2505.

The burden of proving that no material issue of fact remains in dispute rests on the movant. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Once a motion has been made, however, the non-moving party must set forth specific factual allegations to avoid summary judgment. *Kurisoo v. Providence and Worcester R.R. Co.,* 68 F.3d 591, 594 (2nd Cir.1995); *Fahle v. Braslow,* 913 F.Supp. 145, 149 (E.D.N.Y. 1996), *aff'd,* 111 F.3d 123 (2nd Cir.1997) (citations omitted). Conclusory, *ipse dixit* assertions will not defeat a summary judgment motion. *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2nd Cir.1990). Although the non-moving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment, Rule 56(c) and (e) provide that the non-moving party cannot rest on the pleadings but must set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions on file showing there is a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548 (1986); *United States v. Rem,* 38 F.3d 634 (2nd Cir.1994). Any ambiguities and all inferences must be drawn in favor of the nonmovant. *Institute for Shipboard Educ. v. Cigna Worldwide Ins. Co.,* 22 F.3d 414, 418 (2nd Cir. 1994); *Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2nd Cir. 1990).

District courts should be particularly wary of granting judgment in employment discrimination cases because

direct evidence of the defendant's discriminatory intent is rare. *Gallo v. Prudential Residential Services Ltd. Partnership*, 22 F.3d 1219, 1224 (2nd Cir. 1994). However, the purposes of summary judgment—avoiding protracted and expensive litigation—apply no less to discrimination cases than to other kinds of trials, *Johnson v. New York City Bd. of Educ.*, 2000 WL 1739308, at *1 (E.D.N.Y. Oct.10, 2000) (citing *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2nd Cir.1996)), and summary judgment is not necessarily precluded even when intent is at issue. *Taylor v. Polygram Records*, 1999 WL 124456, at *7 (S.D.N.Y. Mar.8, 1999).

## B. LIMITATIONS PERIODS

A number of different periods of limitation apply to the various claims in this action, including limitations on the times when claims may be asserted before the EEOC and when actions may be brought in federal court. The various periods are considered separately below.

### 1. *Title VII and the ADEA*

#### (a) *Filing Charges with the EEOC*

■ Under both Title VII and the ADEA, a plaintiff must file a charge of discrimination with the EEOC within 180 days after the claim accrued, or within 300 days after the claim accrued if he has filed a charge with a state agency that has authority to investigate such claims. *See* 42 U.S.C. § 2000e–5(e)(1); 29 U.S.C. §§ 626(d)(1), 633(b); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2nd Cir. 1998). The plaintiff filed his charge of discrimination with the EEOC on April 21, 1992. Although there is no evidence that the plaintiff filed a charge of discrimination with any state agency in connection with his claims in this action, the parties and the EEOC investigator who was assigned to the plaintiff's complaint have all assumed that the 300–day limitation period applies, and the court therefore adopts that period for its analysis.[6] Accordingly, claims of discrimination under Title VII and the ADEA that accrued more than 300 days before April 21, 1992—i.e., before June 26, 1991—are barred.

In view of the above limitations period, a number of the plaintiff's Title VII and ADEA claims are barred because they accrued before June 26, 1991. These include the claims based on the following events: (1) the denial of a continuing appointment for the 1989 fiscal year (Complaint ¶ 8(b)); (2) the plaintiff's demotion to Research Assistant in 1988 (Complaint ¶ 9(a)); (3) the failure to promote the plaintiff in 1990 (Complaint ¶ 9(b)); (4) the plaintiff's demotion to technician for the 1991 fiscal year which commenced on October 1, 1990 (Complaint ¶ 9(c)); (5) any failures to give the plaintiff raises in pay prior to June 26, 1991 (Complaint ¶¶ 12, 22); (6) any failures to give the plaintiff promotions prior to June 26, 1991 (Complaint ¶ 12); (7) the reduction in the plaintiff's pay in January 1990 (Complaint ¶ 20(a)); (8) the failure to assign the plaintiff to the PETC–2 research program for the 1991 fiscal year (Complaint ¶ 20(b)); (9) the denial to the plaintiff of the opportunity to seek research funds on May 14, 1990 (Complaint ¶ 21(b)); (10) the removal of the plaintiff as principal investigator of the METC–3 program in November 1990 (Complaint

---

6. This is apparently the result of a Work Sharing Agreement in effect between the New York State Division of Human Rights ("NYSDHR") and the EEOC, under which a charge of discrimination filed with either agency is deemed constructively to be cross-filed with the other. *See Govia v. Century 21, Inc.*, 140 F.Supp.2d 323, 325 n. 1 (S.D.N.Y. 2001).

¶ 23(a)); and (11) any failure to pay a salary equivalent to similarly situated white persons prior to June 26, 1991 (Complaint ¶ 28).

### (b) *The Continuing Violation Doctrine*

In an effort to save those claims from extinguishment, the plaintiff argues that the continuing violation doctrine preserves the claims that accrued before June 26, 1991. The continuing violation doctrine "extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination." *Kulkarni v. City University of New York*, No. 01 CV 3019(DLC), 2001 WL 1415200, at * 3 (S.D.N.Y. Nov.13, 2001) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2nd Cir.1998)). Under the continuing violation exception, if a plaintiff has filed a charge of discrimination "that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Lambert v. Genesee Hospital*, 10 F.3d 46, 53 (2nd Cir.1993), *cert. denied*, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). To take advantage of the continuing violation exception, however, a plaintiff must clearly assert that theory of timeliness both in his EEOC charge and in his complaint. *See Fitzgerald v. Henderson*, 251 F.3d 345, 360 (2nd Cir. 2001); *Miller v. International Tel. & Tel. Corp.*, 755 F.2d 20, 25 (2nd Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985).

In general, the continuing violation exception is looked upon unfavorably by the courts of this circuit. *Brown v. Time, Inc.*, 1997 WL 231143, at * 3 (S.D.N.Y. May 7, 1997) (citing *Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1415 (S.D.N.Y. 1989)). The exception usually applies only in those cases involving specific discriminatory policies or mechanisms, such as discriminatory seniority lists or employment tests. *E.g., Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2nd Cir.1992); *Kulkarni*, 2001 WL 1415200, at * 3 (citations omitted). Thus, the exception does not apply to discrete, completed employment actions such as transfers, failures to promote, demotions, or inadequate wages. *See, e.g., Griffin v. New York City Off–Track Betting Corp.*, 2002 WL 252758, at * 2 (S.D.N.Y. Feb.20, 2002) (citing *Lightfoot*, 110 F.3d at 907; *Crosland v. City of New York*, 140 F.Supp.2d 300, 308 (S.D.N.Y. 2001)); *Malarkey v. Texaco*, 559 F.Supp. 117, 121 (S.D.N.Y.1982), *aff'd*, 704 F.2d 674 (2nd Cir.1983) (per curiam). It "would subvert the underlying purpose of the time limit, which is to ensure expedition in the filing and handling of claims of discrimination," to apply the continuing violation exception .in cases where a plaintiff is on notice of alleged discriminatory acts. *Govia v. Century 21, Inc.*, 140 F.Supp.2d 323, 325 (S.D.N.Y.2001).

A hostile work environment claim is also treated essentially as a continuing violation. *Elmenayer v. ABF Freight System, Inc.*, 318 F.3d 130, 134 (2nd Cir.2003) (citing *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 2074, 153 L.Ed.2d 106 (2002). Thus, "[a] claim of hostile work environment is timely so long as one act contributing to the claim occurred within the statutory period; if it did, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'" *Patterson v. County of Oneida*, 375 F.3d 206, 220 (2nd Cir.2004) (quoting *Morgan*, 536 U.S. at 117, 122 S.Ct. 2061). Hostile work environment claims typically require proof "that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the

conditions of plaintiff's work environment." *Payne v. New York City Transit Authority,* 349 F.Supp.2d 619, 624 (E.D.N.Y.2004) (citing *Mack v. Otis Elevator Co.,* 326 F.3d 116, 122 (2nd Cir.2003))). A hostile work environment claim does not, however, resuscitate time-barred claims based on discrete acts such as terminations, failures to promote, refusals to transfer and the like. *See Petrosino v. Bell Atlantic,* 385 F.3d 210, 220 (2nd Cir.2004) and *Elmenayer,* 318 F.3d at 134 (both citing *Morgan,* 536 U.S. at 114, 122 S.Ct. 2061).

██ Applying these principles, the court concludes that the continuing violation doctrine does not preserve the plaintiff's Title VII and ADEA claims arising from employment actions occurring before June 26, 1991. First, the continuing violation doctrine was not pleaded in the plaintiff's charge of discrimination filed with the EEOC, and the EEOC investigator who reviewed the plaintiff's charge did not regard it as stating such a theory. Holland Aff. ¶ 2. Nor is the theory clearly articulated in the plaintiff's second amended complaint. The 22–page, single-spaced complaint contains three isolated sentences in which the plaintiff alleges that he was "informed" and "believes" that BNL maintained a "pattern and practice" of discrimination against minorities in general, and against Asian Indians in particular.[7] The allegations are conclusory and the complaint states no specific facts to support the existence of any such pattern and practice.

Moreover, the plaintiff has neither pleaded, nor demonstrated, that any of the actions about which he complains were undertaken in pursuance of a discriminatory seniority policy or employment test. Rather, the actions were discrete events to which the continuing violation doctrine does not apply: failures to obtain promotions and pay raises, demotions and reductions in pay, and failures to obtain certain assignments. They occurred at different times, and the decisions were made by different persons. The plaintiff was on notice of the decisions, and any discriminatory animus that may have attended them, at the times when the decisions were made. Aside from the plaintiff's allegation that the decisions were motivated by discrimination, the plaintiff has not demonstrated that they were related or were the product of some overarching policy of discrimination against Asian Indians. Accordingly, putting aside the hostile work environment claim which is addressed separately below, the court concludes that there is no evidence to support the application of the continuing violation doctrine in this action.

(c) *Filing Complaints in Court*

██ A second statute of limitations applies to Title VII and ADEA claims. Before a plaintiff may assert such claims in a lawsuit, the plaintiff must receive a notice, commonly known as a right-to-sue letter, from the EEOC. 42 U.S.C. § 2000e–5(f)(1); *Baldwin County Welcome Center*

7. The allegations are as follows: "Plaintiff is informed and believes that BNL maintained and continues to maintain a discriminatory pattern and practice of placing highly educated minorities in low level positions and low paying jobs which have less room for professional advancement." Complaint ¶ 9(c); "Plaintiff is informed and believes that the defendants maintained and continues to maintain a discriminatory pattern and prac-

tice with respect to discharge and other conditions and privileges of employment which continues to exert disproportionate effect on the minorities in general, Asian Indians in particular." *Id.* ¶ 12(a); "Upon information and belief, AUI/BNL continued and continue to maintain a discriminatory pay system and a pattern and practice of giving minorities only smaller pay raise or no pay raise at all compared to white employees." *Id.* ¶ 14.

*v. Brown,* 466 U.S. 147, 149, 104 S.Ct. 1723, 80 L.Ed.2d 196 (U.S.1984). Thereafter, the plaintiff has 90 days within which to institute a legal action. *Id.* The 90–day period is measured from the time when the plaintiff receives the right-to-sue letter. *Sherlock v. Montefiore Medical Center,* 84 F.3d 522, 525 (2nd Cir.1996). In the absence of contrary evidence, there is a presumption that the plaintiff received the letter three days after it was mailed, and that the date of the letter is the date of mailing. *Id.* at 525–26 (citing *Baldwin County Welcome Center v. Brown,* 466 U.S. at 148 & n. 1).

The defendants contend that the plaintiff failed to file this action within the 90–day period and that accordingly his Title VII and ADEA claims are time-barred. The facts concerning mailing and receipt are not in dispute. On January 14, 1994, the plaintiff telephoned Peter Holland, the EEOC investigator who was handling his complaint, to inquire about obtaining a right-to-sue letter. Holland Aff., ¶¶ 1, 4. He followed the telephone call with a memorandum which the EEOC received on January 25, 1994. *Id.* ¶ 4; Sundaram Dep. Ex. 31. On January 27, 1994, the EEOC sent a Notice of Right to Sue letter by certified mail to the plaintiff at his residence. Holland Aff. ¶ 5. According to records of the United States Postal Service, an attempt to deliver the certified letter was made on January 31, 1994. Salerno Aff., ¶ 9. As delivery could not be completed, a notice was left in the plaintiff's mailbox that day advising him that he could pick up the article at the post office. *Id.* ¶ 10. When the plaintiff did not pick the item up within five days, a second delivery was attempted on February 7, 1994. *Id.* ¶ 11. Because the delivery

again could not be made, a second notice was left which specifically identified the item to be delivered as a "letter" and the sender as the "EEO." *Id.* ¶¶ 11–12 & Ex. A. The plaintiff eventually retrieved the letter on February 15, 1994. *Id.* ¶ 14 & Ex. A.

■ The plaintiff filed this action on May 12, 1994, more than 90 days after delivery of the right-to-sue letter was attempted on January 31 and February 7, 1994, but less than 90 days after the letter was actually retrieved by the plaintiff. The circumstances thus present starkly the question whether the letter is deemed to have been received by the plaintiff when he received notice of delivery, as the defendants contend, in which case his Title VII and ADEA claims are time-barred; or when he actually received the letter, as the plaintiff contends, in which case those claims are timely.

In *Sousa v. N.L.R.B.* the Second Circuit used the date of actual receipt to calculate the statutory period[8] where a notice of certified mail was placed in the plaintiff's post office box on September 5 but he did not retrieve the letter until September 10. 817 F.2d 10, 10–11 (2nd Cir.1987). The court expressly premised its decision, however, on the determination that "[a] 5–day delay, which included a weekend, is not an unreasonable time for Sousa to have failed to visit the box." *Id.* at 11. The court further observed that an "unexplained failure to visit a post office box for a long period of time might result in a different conclusion," and pointedly rejected a Third Circuit decision which held that delivery of two notices of certified mail to a plaintiff did not trigger the statute of limitations. This led the court in *O'Neal v. Marine Midland Bank, N.A.,* 848 F.Supp. 413

---

**8.** Because the defendant was a federal agency, a 30–day period was applicable rather than the 90–day period at issue here.

(W.D.N.Y.1994), to conclude that "when a claimant cannot offer a reasonable explanation for her failure to check her mailbox or pick up certified mail for an extended amount of time the 90–day statute of limitations clock should begin to run on a date before actual receipt of the right-to-sue notice." *Id.* at 419.

 Other circuits have taken conflicting approaches. In *Watts–Means v. Prince George's Family Crisis Ctr.,* 7 F.3d 40, 41–42 (4th Cir.1993), the Fourth Circuit held that delivery of the notice to pick up certified mail triggered the running of the period when the plaintiff waited five days before picking up the mail. The Sixth Circuit has held that the right-to-sue letter is deemed received five days after it is mailed, absent proof to the contrary, and that delivery of a notice to pick up certified mail constitutes constructive receipt of the letter. *Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552, 557–58 (6th Cir.2000); *Hunter v. Stephenson Roofing, Inc.,* 790 F.2d 472, 475 & n. 7 (6th Cir.1986). The Tenth Circuit, on the other hand, has chosen the date when the plaintiff actually picked up the certified mail, rather than the date of delivery of the notice, as the triggering date for the commencement of the 90–day limitations period. *Jackson v. Continental Cargo–Denver,* 183 F.3d 1186, 1189–90 (10th Cir. 1999). The court there also recognized, however, that an earlier date might apply if a plaintiff knew or had reason to know that the certified mail was a right-to-sue letter but delayed picking it up in order to manipulate the limitations period. *Id.* at 1190 n. 1. Finally, the Seventh Circuit has

adopted the rule "that when the EEOC sends a right-to-sue letter by certified mail, the 90–day limitations period presumptively begins to run on the day the plaintiff actually received the letter, so long as she picks it up within the time that the Post Office's notice gives her before it will be returned to the sender." *Houston v. Sidley & Austin,* 185 F.3d 837, 839 (7th Cir.1999).

The Seventh Circuit's rule appears to be the most sensible for the circumstances presented here. It has the benefit of establishing a bright line, thus avoiding inquiry and litigation concerning a plaintiff's knowledge of the contents of the letter and motivation for delaying receipt, as well as uncertainty about whether delays in picking up the letter were unreasonable. Thus, in the present case, since the plaintiff picked up the letter within the time specified by the Postal Service (albeit the last day before return), the statutory period should commence on that date. Because he commenced this action within 90 days after that date, it is timely.[9]

### 2. *Section 1981*

Determining the limitations periods applicable to the plaintiff's claims under section 1981 requires an examination of section 1981 as it was interpreted by the Supreme Court prior to 1991, and a statutory amendment in 1991 that expanded the scope of section 1981. The issue also entails analysis of a statute enacted in 1990 that enlarged the statute of limitations for some federal actions.

---

**9.** The court recognizes that there is a substantial basis in the evidence to conclude that the plaintiff was indeed manipulating the statute of limitations. He was in his final year of law school, and therefore not an unsophisticated *pro se* plaintiff. Because he instigated the sending of the right-to-sue letter by telephon-

ing and then writing to the investigator handling his case at the EEOC, he likely knew precisely what the certified mail concerned. Yet, he waited until the last day before the item was to be returned to the sender before retrieving the item.

Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white persons." 42 U.S.C. § 1981(a). Prior to the amendment of section 1981 enacted on November 21, 1991, the Supreme Court had determined that the statute was not "a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts." *Patterson v. McLean Credit Union,* 491 U.S. 164, 176, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989). Thus, section 1981 did not apply to any conduct by an employer that occurred after the employment relationship had been established, and could not be used to redress a whole host of discriminatory treatment including discriminatory working conditions, *id.* at 177, 109 S.Ct. 2363; racial harassment, *id.* at 178–79, 109 S.Ct. 2363; retaliation, *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684, 692–93 (2nd Cir.1998); and termination, *Patterson v. Intercoast Mgmt. of Hartford, Inc.,* 918 F.2d 12, 14 (2nd Cir. 1990), *cert. denied,* 500 U.S. 906, 111 S.Ct. 1686, 114 L.Ed.2d 81 (1991).

The amendment of section 1981 that occurred in November 1991 expanded the scope of protection offered by the statute by redefining the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Thus, after November 21, 1991, discriminatory conduct previously excluded from coverage by *Patterson v. McLean Credit Union* became actionable under section 1981. Section 1981 was not given retroactive effect, however. *Rivers v. Roadway Exp., Inc.,* 511 U.S. 298, 303, 114 S.Ct. 1510, 1514–15, 128 L.Ed.2d 274

(1994). As a result, the expanded definition of "make and enforce contracts" does not apply to conduct occurring before November 21, 1991. *Id.* at 313, 114 S.Ct. at 1519–20.

■ The above discussion concerning the scope of coverage of section 1981 is significant to the determination of the applicable statute of limitations because of the impact of another recent federal enactment on the statute of limitations for section 1981 actions. Like many federal statutes, section 1981 does not contain a statute of limitations. As a result, the Supreme Court had directed that federal courts should look to analogous state law to supply the statute of limitations for section 1981 actions. *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 371, 124 S.Ct. 1836, 1839, 158 L.Ed.2d 645 (2004) (citing *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987)). Thus, in New York a three-year statute of limitations was held to be applicable to section 1981 actions. *Butts v. New York City Dep't of Housing,* 990 F.2d 1397, 1412 (2nd Cir.1993). In 1990, however, Congress enacted a "catchall" statute of limitations provision prescribing a four-year limitations period for all civil actions "arising under an Act of Congress enacted *after* the date of the enactment" of the catchall provision. 28 U.S.C. § 1658(a) (emphasis added). The Supreme Court recently held in *R.R. Donnelley & Sons Co.,* 541 U.S. at 382, 124 S.Ct. at 1845, that this four-year limitations period applies to actions under section 1981 "if the plaintiff's claim against the defendant was made possible by" the 1991 amendment to that section. Thus, claims based on conduct occurring after November 21, 1991 which could not have been brought under section 1981 prior to that date because of the decision in *Patterson v. McLean Credit Union* are sub-

ject to the four-year limitations period prescribed in 28 U.S.C. § 1658(a). Because the Court's decision in *R.R. Donnelley & Sons Co.* did not disturb its prior decisions in *Goodman v. Lukens Steel Co.* and *Patterson v. McLean Credit Union,* however, claims arising under section 1981 prior to November 21, 1991 remain subject to the three-year statute of limitations. *See R.R. Donnelley & Sons Co.,* 541 U.S. at 382, 124 S.Ct. at 1845 (holding "leaves in place the 'borrowed' limitations periods for *preexisting* causes of action.") (emphasis added)

■ The net result of the above analysis of the statutes and Supreme Court decisions concerning the limitations periods applicable the plaintiff's claims under section 1981 here is that the three-year statute of limitations is applicable to all claims arising from conduct and events that occurred prior to November 21, 1991. Since this action was filed on May 12, 1994, all claims under section 1981 arising from conduct that occurred before May 12, 1991 are barred. These include the claims based on the following events: (1) the denial of a continuing appointment for the 1989 fiscal year (Complaint ¶ 8(b)); (2) the plaintiff's demotion to Research Assistant in 1988 (Complaint ¶ 9(a)); (3) the failure to promote the plaintiff in 1990 (Complaint ¶ 9(b)); (4) the plaintiff's demotion to technician for the 1991 fiscal year which commenced on October 1, 1990 (Complaint ¶ 9(c)); (5) any failures to give the plaintiff raises in pay prior to May 12, 1991 (Complaint ¶¶ 12, 22); (6) any failures to give the plaintiff promotions prior to May 12, 1991 (Complaint ¶ 12); (7) the reduction in the plaintiff's pay in January 1990 (Complaint ¶ 20(a)); (8) the failure to assign the plaintiff to the PETC–2 research program for the 1991 fiscal year (Complaint ¶ 20(b)); (9) the denial to the plaintiff of the opportunity to seek research funds on

May 14, 1990 (Complaint ¶ 21(b)); (10) the removal of the plaintiff as principal investigator of the METC–3 program in November 1990 (Complaint ¶ 23(a)); and (11) any failure to pay a salary equivalent to similarly situated white persons prior to May 12, 1991 (Complaint ¶ 28).

### 3. *State Human Rights Law*

■ The statute of limitations applicable to the state Human Rights Law, N.Y. Exec. Law § 297, is three years. *Murphy v. Amer. Home Prod. Corp.,* 58 N.Y.2d 293, 307, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983); N.Y.C.P.L.R. § 214(2). The statute is tolled, however, during the pendency of any complaint that is filed with the NYDHR. *Penman v. Pan American World Airways, Inc.,* 69 N.Y.2d 989, 990–91, 517 N.Y.S.2d 719, 719, 510 N.E.2d 803 (1987). Because complaints filed with the EEOC are deemed constructively to be cross-filed with the NYDHR, the statute is also tolled during the pendency of a claim filed with the EEOC. *E.g., Lee v. Overseas Shipholding Group, Inc.,* No. 00 Civ. 9682(DLC), 2001 WL 849747, *8 (S.D.N.Y. July 30, 2001); *Martinez–Tolentino v. Buffalo State College,* 277 A.D.2d 899, 899, 715 N.Y.S.2d 554, 555 (4th Dept.2000).

■ Applying the above principles to the claims in this case, the instant action was filed on May 12, 1994 and the three-year statute of limitations thus makes claims based on events occurring after May 12, 1991 timely. Because of the tolling provisions of New York law, however, the period between April 21, 1992 (when the plaintiff filed his complaint with the EEOC) and January 27, 1994 (when the EEOC terminated its proceedings with the issuance of a right to sue letter)—a total of 646 days—is excluded. The effective date of the statute of limitation is thus backdated 646 days from May 12, 1991, which yields a new effective date of August 4,

1989. Claims under the Human Rights Law based on events occurring after August 4, 1989 are therefore timely, and those preceding that date are barred. The claims that are barred are those based on the following events: (1) the denial of a continuing appointment for the 1989 fiscal year (Complaint ¶ 8(b)); (2) the plaintiff's demotion to Research Assistant in 1988 (Complaint ¶ 9(a)); (3) any failure to pay a salary equivalent to similarly situated white persons prior to August 4, 1989.[10]

### 4. *Intentional Infliction of Emotional Distress*

■ The statute of limitations for claims of intentional infliction of emotional distress is one year. *Rosado v. City of New York*, 713 F.Supp. 124, 125 (S.D.N.Y. 1989) (citing *Jemison v. Crichlow*, 139 A.D.2d 332, 531 N.Y.S.2d 919 (2nd Dep't 1988), *aff'd*, 73 N.Y.2d 868, 537 N.Y.S.2d 487, 534 N.E.2d 325 (N.Y.1989) (applying N.Y. C.P.L.R. § 215(3))). Thus, any claims here for intentional infliction of emotional distress arising prior to May 12, 1993 are barred. Since all of the events upon which the plaintiff's claims are premised here predate May 12, 1993, any claim for this tort is barred.

### 5. *ERISA Claim: Denial of Severance Benefits*

■ Under section 413(2) of ERISA, the statute of limitations for the plaintiff's ERISA claim based on the defendants' denial of severance pay is three years. *See Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2nd Cir.2001); 29 U.S.C. § 1113(2). The defendants argue that the plaintiff's claim is barred because it was first made in the second amended complaint, which was filed in January 1995,

more than three years after his employment ended and his claim for severance benefits was denied. The argument overlooks Rule 15 of the Federal Rules of Civil Procedure which provides, in part,

> An amendment of a pleading relates back to the date of the original pleading when
>
> . . .
>
> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. . . .

Fed.R.Civ.P. 15(c)(2). In his original complaint, filed on May 12, 1994, the plaintiff alleged that he was denied severance pay. Thus the ERISA claim made in the second amended complaint is based on "the conduct, transaction, or occurrence set forth" in the original complaint, and relates back to May 12, 1994, which was less than three years after severance benefits were denied. Accordingly, the claim is not barred by the statute of limitations.

### 6. *Tortious Interference with Contract*

■ Under New York law, claims for tortious interference with contract and prospective contractual relations are subject to a three-year statute of limitations. *See, e.g., Legion of Christ, Inc. v. Rita Cohen Realty Services, Ltd.*, 1 A.D.3d 572, 572, 767 N.Y.S.2d 632, 632 (2nd Dep't 2003); *Vanderminden v. Vanderminden*, 226 A.D.2d 1037, 1043, 641 N.Y.S.2d 732, 738 (3rd Dep't 1996); N.Y. C.P.L.R. § 214[4]. The plaintiff's tortious interference claims here, by his own admission, stem from alleged conduct occurring in September of 1990, more than three years before the initial complaint was filed. *See*

---

**10.** As discussed below, the remaining state law claims are subject to dismissal under the

federal enclave doctrine.

Sundaram Dep. 633–38. The claims are therefore barred.

## C. JURISDICTION

### 1. *Title VII and the ADEA*

The defendants contend that the court may not exercise jurisdiction to decide the plaintiff's claims of harassment, retaliation, and failure to rehire insofar as they are made under Title VII and the ADEA because the plaintiff failed to include those claims in the complaint he filed with the EEOC.

 "Exhaustion of administrative remedies through the EEOC is 'an essential element' of the Title VII and ADEA statutory schemes and, as such, a precondition to bringing such claims in federal court." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A,* 274 F.3d 683, 686 (2nd Cir.2001) (citing *Francis v. City of New York,* 235 F.3d 763, 768 (2nd Cir.2000)). "Thus, a district court only has jurisdiction to hear such claims where they were either included in an EEOC charge or are based on conduct subsequent to the charge which is 'reasonably related' to that alleged in the EEOC charge." *Sussle v. Sirina Protection Systems Corp.,* 269 F.Supp.2d 285, 314 (S.D.N.Y.2003) (citing *Butts v. N.Y. Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1401 (2nd Cir.1993), *superseded by statute on other grounds as stated in Hawkins v. 1115 Legal Service Care,* 163 F.3d 684 (2nd Cir.1998)).

Adherence to this jurisdictional prerequisite is essential to preserve the purpose of filing an EEOC charge, "which is to encourage settlement of discrimination claims through conciliation and voluntary compliance." *Butts,* 990 F.2d at 1401. That purpose would be defeated if a plaintiff could bring claims in a lawsuit which had not been presented to, and investigated by, the EEOC. *Id.*

 In *Butts,* which remains the leading exposition of the law in this Circuit concerning the issue, the court carefully categorized the three situations in which claims are deemed "reasonably related" to claims made in an EEOC complaint such that they may be brought in a subsequent lawsuit even though they were not included in the EEOC complaint. The first situation involves claims "where the conduct complained of would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Id.* at 1402 (quoting *Smith v. American President Lines, Ltd.,* 571 F.2d 102, 107 n. 10 (2nd Cir.1978)). This category of "reasonably related" claims is an allowance for loose pleading in recognition of the fact that EEOC complaints are often prepared, not by lawyers, but by employees unschooled in the nuances of the terminology found on the forms used for filing such complaints. *Butts,* 990 F.2d at 1402; *see, e.g., Sharabura v. Taylor,* No. 03 CV 1866(JG), 2003 WL 22170601, at *2–3 (E.D.N.Y. Sept.16, 2003).

 The second category of "reasonably related" claims are those alleging retaliation against an employee for filing an EEOC charge. Here the requirement of filing an EEOC charge is relaxed because of the close connection of the retaliatory act to the initial charge of discrimination and to the filing of the charge itself. *Butts,* 990 F.2d at 1402. Such claims of retaliation must, however, be based on conduct that occurred subsequent to the filing of the EEOC charge. *See, e.g., Sussle v. Sirina Protection Systems Corp.,* 269 F.Supp.2d 285, 314–15 (S.D.N.Y.2003); *Manessis v. New York City Dept. of Transp.,* No. 02 Civ. 359, 2003 WL 289969, *12 (S.D.N.Y. Feb. 10, 2003).

Finally, the third category of "reasonably related" claims are claims where the plaintiff alleges further incidents of discrimination carried out in precisely the same manner as those alleged in the EEOC charge. *Butts,* 990 F.2d at 1402–03. The relaxation of the filing requirement for these claims is in recognition of the probable futility of a further effort by the EEOC to conciliate such a claim when a previous charge alleging the exact same method of discrimination could not be resolved through conciliation. *Id.*

The above principles compel the conclusion that the court has no jurisdiction over the plaintiff's harassment claim under the ADEA. Any such harassment would have to be based on workplace conduct that predated the plaintiff's termination, yet there is no mention of harassment because of the plaintiff's age in his EEOC charge which was filed long after he was terminated. Similarly, there is no jurisdiction for most of the plaintiff's harassment claims under Title VII. The only statements in the plaintiff's EEOC charge that may be construed as harassment are found in ¶ 8 in which the plaintiff alleges that defendants Petrakis and Hendry made insulting remarks to the plaintiff concerning his ethnicity and applied oppressive policies against him along with Steinberg, Lynn and Manowitz. Thus, except to the extent that the plaintiff presses harassment claims based on such insulting comments and oppressive policies relating to his ethnic origin, all Title VII harassment claims should be dismissed.

The plaintiff's failure to rehire claims under Title VII and the ADEA suffer a similar fate. Those claims relate to alleged applications made by the plaintiff for positions at BNL *after* he was terminated. By his own admission in his Local Civil Rule 56.1 statement, some of those applications were made before he filed his EEOC charge; others were made after he filed the charge. *See* Pl. LR 56.1 Counter–Stmt Appx ¶¶ 26.16.1, 26.17.1, 26.17.2, 26.17.3, 26.17.4, 26.17.5. Yet there is no mention in his EEOC charge of any discriminatory failure to rehire him. Thus, any claims for failure to rehire that arose prior to the charge are clearly barred because they were not included in the charge. *Butts,* 990 F.2d at 1401; *accord, Miller v. International Tel. and Tel. Corp.,* 755 F.2d 20, 25–26 (2nd Cir.)(no jurisdiction over failure to rehire claim when not made in EEOC charge), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122, *reh'g denied,* 474 U.S. 1015, 106 S.Ct. 552, 88 L.Ed.2d 479 (1985). Any claims for failure to rehire that arose after the EEOC charge are also barred as they cannot be found to reasonably relate to the claims made in the EEOC charge. The EEOC charge complains only of pre-termination discriminatory conduct. There is no mention of any failures to rehire occurring before the EEOC charge was made, or of any other post-termination discriminatory conduct by the defendants for that matter. Rather since the EEOC charge only made allegations of discrimination occurring up to the point of termination, and did not allege post-termination discrimination of any kind, alleged failures to rehire would not fall within the "scope of the EEOC investigation which [could] reasonably be expected to grow out of the charge of discrimination." *Butts,* 990 F.2d at 1402.[11]

Finally, the retaliation claims are also barred to the extent they relate to any

---

**11.** The pre-EEOC charge failure-to-rehire claims are nevertheless cognizable under Section 1981 insofar as they rest on allegations of discrimination based on race, color or national origin. See discussion *infra* at Part II(D)(1)(b)(iv).

conduct occurring up to the point when the EEOC charge was filed on April 21, 1992. There is no mention in the EEOC charge of retaliation because of protected activity, and there are no facts alleged in the charge that could reasonably be construed to make any such claims. On the other hand, however, to the extent that the plaintiff can establish a retaliatory motive for any conduct by the defendants that occurred after he filed his charge, the plaintiff would have a cognizable claim for retaliation because it would be deemed "reasonably related" to the claims in the charge under the second prong of the *Butts* analysis above. Here, the only discrimination alleged to have occurred after the filing of the EEOC charge concerns an alleged failure to rehire the plaintiff for a position to which he applied. Thus, the court would have jurisdiction, on a retaliation theory, over the failure to rehire claim that arose *after* the EEOC charge was filed.

To sum up, with respect to the plaintiff's claims of harassment, retaliation, and failure to rehire made under Title VII and the ADEA, the court has jurisdiction to hear only the plaintiff's claim of harassment on the basis of ethnic origin and the claim of retaliation for failure to rehire after April 21, 1992. All other claims for harassment, failure to rehire, and retaliation under Title VII and the ADEA should be dismissed for lack of jurisdiction.

### 2. *The Federal Enclave Doctrine*

The defendants contend that because the Brookhaven National Laboratory is a federal enclave the state antidiscrimination statutes upon which his state law claims of discrimination rest do not apply to the defendants. The argument has merit.

 The United States Constitution provides Congress with exclusive jurisdiction over property "purchased by the Con-

sent of the Legislature of the State in which the Same shall be, for the Erection of Forts, magazines, Arsenals, dock-Yards and other needful Buildings." U.S. Const. art. I, § 8, cl. 17. "It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation." *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 180, 108 S.Ct. 1704,1709, 100 L.Ed.2d 158 (1988) (citing *EPA v. State Water Resources Control Board,* 426 U.S. 200, 211, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976); *Hancock v. Train,* 426 U.S. 167, 178–179, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976); *Mayo v. United States,* 319 U.S. 441, 445, 63 S.Ct. 1137, 87 L.Ed. 1504 (1943)). Thus, "a federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation." *Goodyear Atomic Corp.,* 486 U.S. at 181, 108 S.Ct. 1704 (citing *Hancock,* 426 U.S. at 168–79, 96 S.Ct. 2006). Under the federal enclave doctrine, a state loses the right to legislate with respect to activities occurring in the enclave unless it reserved its right to do so when it consented to the purchase of the property by the United States. *Paul v. United States,* 371 U.S. 245, 268, 83 S.Ct. 426, 440, 9 L.Ed.2d 292 (1963). Thus, although state laws in effect when jurisdiction is transferred to the United States remain in force, subsequently enacted state laws have no application. *Celli v. Shoell,* 995 F.Supp. 1337, 1341 (D.Utah 1998) (citing *Paul v. United States,* 371 U.S. at 268, 83 S.Ct. 426; *James Stewart & Co. v. Sadrakula,* 309 U.S. 94, 99–100, 60 S.Ct. 431, 84 L.Ed. 596 (1940)); *Stokes v. Adair,* 265 F.2d 662, 665 (4th Cir.), *cert. denied,* 361 U.S. 816, 80 S.Ct. 56, 4

L.Ed.2d 62 (1959). The doctrine has been applied uniformly to bar the application of state law, including state discrimination statutes, with respect to activities conducted by private employers on federal enclaves. *See, e.g., Kelly v. Lockheed Martin Services Group,* 25 F.Supp.2d 1, 4–5 (D.P.R.1998) (territory discrimination laws inapplicable to private contractor at federal enclave); *Miller v. Wackenhut Services, Inc.,* 808 F.Supp. 697, 699–700 (W.D.Mo. 1992) (state discrimination laws inapplicable to private employee); *Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976) (state environmental laws inapplicable to federal enclave). Similarly, state common law claims that were not recognized at the time of jurisdictional transfer may not be pressed with respect to activities on federal enclaves. *See Celli v. Shoell,* 995 F.Supp. at 1342–46.

▪ There is no dispute that Brookhaven National Laboratory is a federal enclave to which the doctrine applies. The United States purchased the property from the State of New York under a Deed of Cession of Jurisdiction dated July 17, 1933 signed by the Governor of New York, Herbert H. Lehman, and authorized by law enacted by the state legislature. *See* Deed of Cession, July 17, 1933, Goldman Aff. Ex. C. The Deed granted jurisdiction over the property to the United States with one condition, specifically,

> that the State of New York shall retain a concurrent jurisdiction with the United States on and over the property and premises so conveyed, so far as that all civil and criminal process, which may issue under the laws or authority of the State of New York, may be executed thereon in the same way and manner as

if such jurisdiction had not been ceded . . .

*Id.* at 5. There is also no dispute that the Laboratory performs a federal function. During the period in question here, it was funded almost entirely by grants from the Department of Energy for research programs specifically authorized by that Department. It follows then that state laws enacted after 1933 and state common law claims first recognized after 1933 do not apply to the work of the Laboratory. Neither the New York Human Rights Law nor the New York Civil Rights Law under which the plaintiff presses his discrimination claims here were in effect at that time.[12] Similarly, New York did not recognize claims for breach of contracts of employment implied from employee handbooks or tort claims for unlawful discharge until well after 1933. *See, e.g., Weiner v. McGraw-Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982) (handbook claim first recognized); *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) (rejecting existence of tort claims for abusive or wrongful discharge).

The plaintiff nevertheless argues that the doctrine does not apply here because the Deed of Cession made by the State of New York reserves to the state certain concurrent jurisdiction over the property conveyed. The express terms of the scope of concurrent jurisdiction is extremely limited, however, to the state's right to serve civil and criminal process on the property. Deed of Cession, Goldman Aff. Ex. C, at 5. It does not provide the state with jurisdiction to regulate, by legislation or otherwise, the activities on the enclave. Similar reservations of rights, which are quite

---

**12.** The Human Rights Law was first enacted in 1951, *see* 1951 N.Y. Laws ch. 800, and was later amended to provide a private right of action. *See* N.Y. Exec. Law § 290 *et seq.* The Civil Rights Law was amended to provide a private right of action in 1965. *See* 1965 N.Y. Laws ch. 1031, § 19; N.Y. Civ. Rights Law § 40–c.

common in grants made by states to the United States, *see James v. Dravo Contracting Co.,* 302 U.S. 134, 146, 58 S.Ct. 208, 82 L.Ed. 155 (1937) (reservations of this sort were common and were made in order to prevent the granted places from becoming a sanctuary for fugitives from justice), have never been held to bar application of the federal enclave doctrine. *See, e.g., Celli v. Shoell,* 995 F.Supp. at 1341–1342; *Wackenhut Services, Inc.,* 808 F.Supp. at 699–700; *see also Paul v. United States,* 371 U.S. at 265, n. 31, 83 S.Ct. 426.[13]

The plaintiff also argues that the defense was not pleaded by the defendants and that he therefore has not had an opportunity to conduct discovery to meet it. This argument would have merit if the plaintiff had suggested discovery that he wished to conduct to counter the defense. *See* Fed.R.Civ.P. 56(f). Nor does the court see any fruitful area of discovery that would bear on the facts required to decide whether the Laboratory is a federal enclave, namely that the property was ceded to the United States by the State of New York and that it is used for federal functions. Those facts are essentially unassailable. Accordingly, the court sees no basis for denying judgment to permit further discovery on the issue, and recommends that the plaintiff's state law discrimination claims, as well as his breach of implied contract claims, be dismissed.

### 3. *New York Civil Rights Law § 40–c*

■ Even if the federal enclave doctrine did not apply, the plaintiff's claims

for violations of section 40–c of the New York Civil Rights Law must be dismissed because he failed to give the necessary notice to the Attorney General of New York before making those claims. Section 40–d of the New York Civil Rights Law provides a private right of action to any person who suffers a violation of section 40–c, but further provides, "[a]t or before the commencement of any action under this section, notice thereof shall be served upon the attorney general." N.Y. Civ. Rights Law § 40–d. New York courts have consistently held that notice to the attorney general is an essential prerequisite to actions for violations of section 40–c. *See, e.g., Giaimo & Vreeburg v. Smith,* 192 A.D.2d 41, 45–46, 599 N.Y.S.2d 841, 844 (2nd Dep't 1993); *Silver v. Equitable Life Assur. Soc. of U.S.,* 168 A.D.2d 367, 368, 563 N.Y.S.2d 78, 80 (1st Dep't 1990); *accord Shepard v. Frontier Communications Services, Inc.,* 92 F.Supp.2d 279, 287 (S.D.N.Y.2000); *Harvey v. NYRAC, Inc.,* 813 F.Supp. 206, 212 (E.D.N.Y.1993). Accordingly, the plaintiff's claims for violations of section 40–c of the New York Civil Rights Law should be dismissed.

### D. FACTUAL AND LEGAL INSUFFICIENCY

Putting aside the claims that are time-barred or for which there is no jurisdiction, the claims that remain are (1) the plaintiff's claims of discrimination and retaliation under Title VII, the ADEA, and section 1981, (2) an ERISA claim for denial of severance benefits, and, if deemed to be pleaded, (3) a common law fraud claim.[14]

---

**13.** The plaintiff's reliance on *Goodyear Atomic Corp. v. Miller* for the proposition that a state's law may be applied to a federal enclave is misplaced because the Court there addressed the reach of a state workers' compensation scheme which was specifically authorized by federal statute to apply to federal

facilities. 486 U.S. at 183–86, 108 S.Ct. 1704. No such congressional authorization exists for the application of the state laws at issue here to federal enclaves.

**14.** The plaintiff asserts in his Seventh Claim for Relief that the defendants "made knowing, false, and fraudulent misrepresentations to

### 1. *The Claims of Discrimination*

Before addressing the legal considerations that underlie an analysis of the summary judgment motion, a chronological statement of the various claims of discrimination which will be reviewed for factual sufficiency is useful. As noted above, a number of the events upon which the plaintiff's claims of discrimination rest occurred outside the statute of limitations or were not raised in his EEOC complaint. The events that remain under consideration are those that occurred on or after May 21, 1991 (for claims under § 1981) and on or after June 26, 1991 (for claims under Title VII and the ADEA). The claims that are not time-barred or jurisdictionally barred are those based on the following events: the denial of a tuition reimbursement in August 1991 on the basis of the plaintiff's race, color, national origin or age; the termination of the plaintiff in September 1991 on the basis of his race, color, national origin or age; the harassment of the plaintiff on various occasions prior to September 30, 1991 on the basis of his national origin; and the failure to rehire the plaintiff after September 30, 1991 on the basis of his race, color or national origin.

#### a) *Legal Considerations*

■■■■■ Whether brought under Title VII or section 1981, plaintiff's claims of discrimination are analyzed under the familiar burden-shifting framework set forth in *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2nd Cir.2005) (ADEA and Title VII); *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2nd Cir.2003) (Title VII); *McLee v. Chrysler Corp.*, 109 F.3d 130, 134–35 (2nd Cir.1997) (Title VII and § 1981); *Potenza v. City of New York*

him," suggesting that he was making a claim

*Dept. of Transp.*, No. 00 Civ. 707, 2001 WL 1267172, at *9 (S.D.N.Y. Oct. 23, 2001). First, the plaintiff must offer evidence to establish a prima facie case of discrimination. This burden is often met by a demonstration that the plaintiff (1) belonged to a protected class, (2) was performing his duties satisfactorily, (3) suffered an adverse employment action, and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of the plaintiff's membership in the protected class. *See, e.g., St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2nd Cir.1995). Plaintiff's burden at this stage is *de minimis*. *Quaratino v. Tiffany & Co.*, 71 F.3d at 65. Once the plaintiff proves his prima facie case, there is a "presumption that the employer unlawfully discriminated against the employee." *Scaria v. Rubin*, 117 F.3d 652 (2nd Cir.1997) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)).

■■■■■ The defendant is then required to articulate a legitimate and nondiscriminatory explanation for its conduct. *Id.* at 654. This burden is meant primarily to compel the defendant to speak rather than "simply [remain] silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Fisher v. Vassar College*, 114 F.3d 1332, 1337 (2nd Cir.1997). Accordingly, the burden is light. *Quinones v. R.H. Macy & Co., Inc.*, 1999 WL 167692, at *4 (E.D.N.Y.Feb.16, 1999). It is satisfied by defendant's mere production of some evidence that its conduct was motivated by legitimate and nondiscriminatory reasons; in other words, there is no burden of proof on defendant to persuade the trier of fact of that reason's truth. *St.*

for fraud.

*Mary's Honor Center,* 509 U.S. at 507, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093); *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2nd Cir.1998).

If the defendant meets this burden of production, the presumption of discrimination created by the plaintiff's prima facie case is rebutted and "simply drops out of the picture." *Id.* at 502, 113 S.Ct. 2742. It does not follow, however, that the plaintiff's Title VII claim is thus defeated. Rather, the defendant's offer of a legitimate reason triggers the next and final phase of the *McDonnell–Douglas* scheme, where the plaintiff must show that the defendant's proffered reasons are a pretextual "mask for unlawful discrimination." *Fisher,* 114 F.3d at 1337 n. 5. In so doing, the plaintiff is required to convince the trier of fact that the defendant's proffered reason is false. *McCarthy v. New York City Technical College of City University of New York,* 202 F.3d 161, 166 (2nd Cir.2000). The jury must also affirmatively believe the plaintiff's claims in addition to disbelieving the defendant. *St. Mary's Honor Center,* 509 U.S. at 519, 113 S.Ct. at 2754. After all, some proffered reasons may be less than credible for reasons not related to discriminatory intent, such as defendant's being "small-minded" or prone to "institutional politics, envy, nepotism, spite or personal hostility." *Fisher,* 114 F.3d at 1338–38.

Although pretext alone does not prove discrimination, it can be strong "circumstantial evidence that is probative of intentional discrimination," and "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Schnabel v. Abramson,* 232 F.3d 83, 90 (2nd Cir.2000)

(plaintiff's prima facie case, in conjunction with evidence of pretext, may in certain instances be sufficient to establish discrimination and defeat summary judgment).

### b) *The Plaintiff's Evidence of Discrimination*

On the question whether the plaintiff has established a prima facie case of discrimination with respect to the four surviving claims of discrimination, the defendants do not dispute that the plaintiff is a member of a protected class and that he performed his duties satisfactorily. As to the claims for denial of tuition reimbursement, termination, and failure to rehire, however, the defendants seriously dispute whether the plaintiff can establish that the circumstances surrounding any of those adverse employment actions give rise to an inference of discrimination on the basis of the plaintiff's membership in a protected class. Moreover, even if any such inference arises, the defendants argue that the plaintiff cannot show that their legitimate, non-discriminatory reasons for each action were simply a pretext for discrimination. Finally, as to the claim for harassment on the basis of national origin, the defendants dispute whether any cognizable adverse employment action has occurred. The court examines the evidence underlying each of the four claims in view of those contentions.

#### (i) *Termination*

The plaintiff undertakes exhaustive efforts to create an illusion of circumstances that give rise to an inference of discrimination in connection with the termination of his employment at Brookhaven. He catalogs numerous incidents in which he contends he was slighted, mistreated, or treated differently from whites. When examined closely, however, the incidents give rise to no inference of discrimination on the basis of membership in a

protected class. Rather, the sequence of events displays clearly that plaintiff's termination resulted simply from a loss of funding for the type of research the plaintiff was doing and had nothing whatsoever to do with his race, color, national origin or age.

As noted earlier, the plaintiff's employment ended on September 30, 1991. It is undisputed that the termination coincided with the termination, by the DOE, of funding for the Mild Gasification project on which the plaintiff had spent most of his research career after August 1986. It is also undisputed that funding for that project had been declining for several years before its termination, and that because of reduced funding the plaintiff's employment at Brookhaven had been in continuous jeopardy since 1989. Indeed, on several occasions prior to the final advice of termination, Brookhaven had advised the plaintiff that his employment would end because of lack of funding, but had rescinded the terminations when funding was found through various means. Finally, it is undisputed that at the same time that the plaintiff's employment ended, not only was the Mild Gasification program terminated, but the entire research group to which the plaintiff had been assigned for virtually his entire career—the Process Sciences Group—was also dissolved because of lack of funding.

A review of the plaintiff's employment at Brookhaven from 1988 until his termination is useful in placing his termination in perspective. By 1988, the plaintiff had worked at Brookhaven for seven years, primarily as a coal chemist, and was therefore at the point where a tenure decision is customarily made. The plaintiff was not recommended for tenure for a variety of reasons—he had authored no peer-reviewed publications, the research programs on which he worked were experiencing funding problems, and he himself had been unable to obtain funding for a viable long term research program as is expected of a scientist who is granted tenure.[15] For substantially the same reasons, he was not offered a continuing appointment which is an appointment without a specified end date. Rather than being terminated, however, he was offered a position on the professional staff on terms set forth in a letter which the plaintiff countersigned to indicate his acceptance. Sundaram Dep. Ex. 8. Thus, beginning on October 1, 1988, the plaintiff was moved from the Scientific Staff to the Professional Staff where he assumed the position of Chemistry Associate I. Id.; Sundaram Dep. 117. The move resulted in no reduction in pay or benefits; rather, the plaintiff received a pay raise. Sundaram Dep. 125.

The following spring, by letter dated April 21, 1989, the chairman of the Department of Applied Sciences, Bernard Manowitz, advised the plaintiff that he would be terminated on May 31, 1989 as part of a reduction in force made necessary by financial shortfalls. Sundaram Dep. Ex. 9; Sundaram Dep. 145–46. When short-term funding was thereafter found, however, the plaintiff's termination was deferred until September 30, 1989, Sundaram Dep. Ex. 10, and when further funding was found his termination was yet again deferred. See Melucci Dep. Ex. 37. By December 1989, however, the plaintiff was again recommended for termination by his immediate supervisor, Meyer Steinberg, because of the continuing funding crisis.[16]

**15.** The plaintiff disputes the reasons offered as the basis for the decision not to grant him tenure. This disputed factual issue is not material, however, because the plaintiff's claims based on the failure to receive tenure are all time-barred.

**16.** Except for a brief period from January 26 through September 30, 1990, the plaintiff

Rather than terminate the plaintiff, however, the new chairman of the DAS, Dr. Leon Petrakis, transferred the plaintiff to the Applied Physics Division of the DAS, headed by Dr. Kelvin Lynn, as part of an overall reorganization of the DAS. Petrakis Dep. 95, 195–99, 203, 254; Lynn Aff. ¶¶ 1–2. There the plaintiff's salary was funded by short-term purchase orders, Petrakis Dep. Ex. 12; Melucci Dep. Ex. 37, a situation which the plaintiff himself recognized was not workable for long. Sundaram Dep. 182, 190; Sundaram Dep. Exs. 13, 20. By the beginning of April, the plaintiff himself expressly acknowledged the budget crisis that affected his position. Sundaram Dep. Ex. 19. As a result, consultations involving Dr. Petrakis, Dr. Lynn, and budget officers at Brookhaven led to the conclusion that the plaintiff's employment would have to be terminated. Petrakis Dep. 304–08; Petrakis Dep. Ex. 12; Melucci Dep. Ex. 37. Dr. Lynn informed the plaintiff of the decision on April 7, 1990, Lynn Aff. ¶ 3 & Ex. B, and on April 19, 1990 he formally requested that termination proceedings be instituted. Id. ¶ 4 & Ex. A.

Upon learning that he would be terminated effective May 31, 1990, the plaintiff asked Dr. Petrakis to review the matter. Sundaram Dep. Ex. 17. Petrakis promptly convened a meeting with the plaintiff, Dr. Lynn, and other key supervisory and budget officers at Brookhaven. As a result of the meeting, the plaintiff's employment was continued for an additional four months to the end of September 1990, with funding for his position to come from the severance pay he would otherwise have received if his employment had terminated on May 31, 1990. Petrakis Dep. 252–53, 438, 501; D'Angio Dep. 79; Melucci Dep. 670–73. A detailed memorandum setting out the terms of the plaintiff's continued employment, including the conditions that had to be met to permit him to continue in employment after September 30, 1990, was countersigned by the plaintiff indicating his agreement. Sundaram Dep. Ex. 20. Among those conditions was the requirement that the plaintiff receive at least $155,000 in funding from the government to provide "full support" for him. Id.

As September 30, 1990 approached it became clear that government funding for the two projects on which the plaintiff was then working, Mild Gasification and Synchrotron Radiation, would be substantially less than the amounts requested by Brookhaven. Instead of the $250,000 requested for each project, DOE provided only $150,000 for Mild Gasification and $173,900 for Synchrotron Radiation. Melucci Aff. ¶¶ 24–25. As funding at those levels was not sufficient to provide full support for the plaintiff, Petrakis notified the plaintiff that his employment would terminate on September 30, 1990 in accordance with the terms of the memorandum countersigned by the plaintiff in May. Sundaram Dep. Ex. 21; Melucci Aff. ¶¶ 24–25.

The plaintiff's employment was saved yet again, however, this time as the result of a letter submitted to the Director of the entire laboratory over the signature of Meyer Steinberg, the plaintiff's former supervisor (before the plaintiff was reassigned to Dr. Lynn in January 1990) on the Mild Gasification program. Sundaram

spent his entire career at Brookhaven in the Process Sciences Group within the DAS. That Group suffered a drop in funding from $2.2 million in fiscal 1986 down to $660,000 by fiscal 1990. Petrakis Dep. 78–79; Melucci Aff. ¶¶ 16–18. Department of Energy funding for the Mild Gasification program, which was the plaintiff's principal work, dropped from $300,000 in fiscal 1989 to $150,000 in fiscal 1991, and went to $0 at the end of fiscal 1991 when the Process Sciences Group was dissolved. Melucci Aff. ¶ 16; Petrakis Dep. 90; Hendrey Dep. 129, 159; Sundaram Dep. 417; Petrakis Aff. Ex. C.

Dep. Ex. 22; Sundaram Dep. 331–35. The letter, which was prepared by the plaintiff, asked that the plaintiff be continued in employment because "his expertise was necessary to the program." Sundaram Dep. Ex. 22; Steinberg Dep. III 112. Given Steinberg's stature as a tenured Senior Engineer, the letter convinced top officials at Brookhaven to extend the plaintiff's employment for a one-year term running from October 1, 1990 through September 30, 1991. Goldman Dep. 46–48; D'Angio Dep. 85. The plaintiff's principal assignment was the Mild Gasification program, and the funds to pay the plaintiff came, in part, from the cancellation of a technician's position in that program. Sundaram Dep. Ex. 24. Petrakis, who was not involved in the decision to rescind the plaintiff's termination and extend the plaintiff's employment, Petrakis Dep. 133, 137, 435–38, advised the plaintiff of his continued employment in a memorandum dated September 27, 1990, which made clear that the plaintiff was receiving "a term appointment for one year and will be subject to renewal upon sufficient funding for [the Mild Gasification] program in subsequent years." Sundaram Dep. Ex. 24.

Sufficient funding for the Mild Gasification program did not occur. Indeed, at the end of the 1991 fiscal year on September 30, 1991, DOE's funding for the program fell to zero. Hendrey Dep. 129; Petrakis Dep. 90; Petrakis Aff. Ex. C; Sundaram Dep. 417. The loss of funding meant that the plaintiff's one-year term appointment could not be renewed, and his employment at Brookhaven terminated. Not only was the Mild Gasification program dissolved, but the Process Science Group, the group to which the plaintiff had been assigned

throughout his career (save the period from January to September 1990 when he was assigned to Dr. Lynn's group), was dissolved as well. Melucci Aff. ¶ 33. The plaintiff's supervisor Meyer Steinberg, being tenured, was reassigned to the Department of Nuclear Energy. Sundaram Dep. 418. One of his other two co-workers on the program, Peter Fallon, was also let go because Brookhaven did not have the funds to pay his salary. Hendrey Dep. 129. No one was hired to replace the plaintiff or to assume his duties. Melucci Aff. ¶ 33.

Given this recitation of the events leading to the plaintiff's termination, it is not surprising that the plaintiff's attempts to establish a *prima facie* case of discrimination, not to mention pretext, fall short. The plaintiff provides no evidence that gives rise to any inference that the decision not to renew his term appointment was based on his race, color, national origin or age. He certainly provides no direct evidence of discrimination in the form of statements or conduct by decisionmakers tending to suggest that his membership in any of the protected classes above had anything to do with his termination. The closest that the plaintiff comes is a statement attributed to Petrakis, the head of DAS, to the effect that he favored the hiring of recent graduates and post-doctoral candidates. Sundaram Dep. Ex. 15.[17] The plaintiff seizes upon the statement as evidence of age discrimination.

■ Assuming for the sake of this motion that the statement was indeed made by Petrakis, however, it is not evidence of age discrimination. The Supreme Court

---

**17.** The statement is attributed to Petrakis by the plaintiff's immediate supervisor for much of his career, Meyer Steinberg, in a memorandum addressed to Sundaram and dated September 27, 1991. Steinberg wrote the memorandum "to clear up my name" with respect to a decision made in November 1990 to remove the plaintiff's name from a work proposal being made to the DOE.

has expressly held that, even where a factor motivating an employer's decision is one that is highly correlated to age, a decision based on that factor does not constitute disparate treatment under the ADEA. *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609–11, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993); *see, e.g., Smith v. Xerox Corp.,* 196 F.3d 358, 367 n. 5 (2nd Cir.1999). Thus, although recent graduates and post-doctorates will generally tend to be younger than those who received their degrees earlier, that factor is analytically distinct from age and is therefore a permissible consideration. *See, e.g., Hazen,* 507 U.S. at 611, 113 S.Ct. at 1707.

■ A plaintiff of course need not have direct evidence of discriminatory motive, but may instead rely on facts supporting an inference of discrimination to meet his burden of establishing a *prima facie* case. *E.g., Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2nd Cir.2005). Often, in termination cases, the plaintiff establishes such an inference by producing evidence that the plaintiff's position remained open after he was discharged, or that he was replaced by someone outside his protected class. *E.g., Tarshis v. Riese Organization,* 211 F.3d 30, 36 (2nd Cir.2000), *abrogated on other grounds by Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 509, 122 S.Ct. 992, 996, 152 L.Ed.2d 1 (2002); *de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Servs.,* 82 F.3d 16, 20 (2nd Cir.1996). The plaintiff provides no such evidence here. There is no dispute that the program to which he was assigned was dissolved, and his position eliminated, so his position obviously did not remain open and he was not replaced by anyone.

The plaintiff seeks to obtain an inference of age discrimination from the fact that two employees ten years younger than he were hired in early 1991, approximately seven months *before* the plaintiff was terminated.[18] Such an inference might arise on a theory that these employees replaced the plaintiff if the plaintiff produced evidence that either or both of these employees began performing tasks that the plaintiff had been performing when he was terminated. *E.g., Montana v. First Federal Sav. and Loan Ass'n of Rochester,* 869 F.2d 100, 105 (2nd Cir.1989). There is no such evidence here. Indeed, there is precious little evidence about what either of these employees did, except that one, Dr. Kumi Pandya, was an expert in EXAFS analysis. Petrakis Dep. 443, 447. Nor is there evidence that they had any connection whatsoever to work done by the plaintiff, except that they may have performed some tasks connected to the Synchrotron Radiation program in 1991.[19] Neither of these younger employees can be said to have replaced the plaintiff, however, because the plaintiff acknowledges that he performed no work on the Synchrotron Radiation program after September 1990,

18. The plaintiff cannot use these newly hired employees as evidence of race, color or national origin discrimination because one of them, Dr. Kumi Pandya, was of Asian Indian origin like the plaintiff. The other, Dr. Yung Jeon, was apparently of Chinese or some other Far East Asian origin.

19. The two principal scientists who worked on the Synchrotron Radiation program in 1991 were Dr. Manowitz and Dr. Barry Gordon. Manowitz Dep. 52–53. Dr. Manowitz testified that one of the two younger employees identified by the plaintiff, Dr. Jeon Yung, "might have" worked on the program, but there is no other evidence of what tasks he performed. *Id.* at 53. Manowitz did not mention the other employee, Dr. Pandya, but an inference can be drawn that he worked on the Synchrotron Radiation program from the fact that he was an EXAFS expert and that EXAFS analysis was used in connection with the program. There is no evidence, however, concerning how much EXAFS work, if any, Pandya actually performed for the program.

well before the two younger employees were hired. Sundaram Dep. 359.

 Perhaps recognizing that he cannot argue that either of the two younger employees assumed any portion of his duties once he was terminated, the plaintiff argues that because he had the *capability* to do EXAFS analysis, the decision to retain Dr. Pandya to do that work instead of giving it to the plaintiff when the Mild Gasification program ended gives rise to an inference of discrimination. The mere fact that an older employee who is laid off has the capability to do tasks performed by a younger employee who is retained, however, does not give rise to an inference of discrimination. *See, e.g., Burger v. New York Institute of Technology,* 94 F.3d 830, 833–34 (2nd Cir.1996). In such circumstances the inquiry is highly fact-specific, and turns in large part on the similarity between the job functions of the older employee and those of the younger employee. *Id.* The plaintiff has not demonstrated any such similarity here. The little that is reflected in the record about Pandya is that he was an EXAFS expert and that he may have performed some EXAFS work in connection with the Synchrotron Radiation program. Petrakis Dep. 443, 447; *see* Pl. LR 56.1 Counter-Stmt at 374. The plaintiff concedes that he was not an EXAFS expert, Sundaram Dep. 620, 632, and that he performed no work on the Synchrotron Radiation program during the 1991 fiscal year, the final year before he was terminated. *Id.* 359, 477–78. Given the dissimilarities in expertise and function between the plaintiff and Pandya, no inference of discrimination arises from the fact that Pandya remained employed after the plaintiff was terminated.

 An inference of discrimination may also be raised by demonstrating that the plaintiff was treated less favorably than similarly situated persons outside the protected class. *See, e.g., Graham v. Long Island R.R.,* 230 F.3d 34, 40 (2nd Cir. 2000). The plaintiff, however, points to no similarly situated white person, or person under 40 years of age, who was retained by Brookhaven at the conclusion of a term appointment when funding for that person's principal project ceased to exist. The plaintiff does attempt to classify several other persons as similarly situated to him, but those attempts do not withstand scrutiny. A person to whom a plaintiff wishes to compare himself must be "similarly situated in all material respects" to the plaintiff. *Id.* at 40 (citing *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2nd Cir.1997)). The plaintiff here suggests that Meyer Steinberg, Peter Fallon, Bernard Manowitz and Barry Gordon, all of whom were listed as co-principal investigators on projects on which the plaintiff was also listed as a principal investigator, are proper comparators. Steinberg, Manowitz and Gordon were not similarly situated, however, for the simple reason that they were on the Scientific Staff with either tenure (Steinberg and Manowitz) or a continuing appointment (Gordon) while the plaintiff was on the Professional Staff with only a term appointment. The distinction is substantial because employees with tenure or a continuing appointment on the Scientific Staff may be discharged under Brookhaven's employment policies only in limited circumstances. *See* Scientific Staff Manual, Sundaram Ex. 2, at 4–5. The plaintiff's one-year term appointment, on the other hand, provided no protection against discharge at the end of the term. *See* Employee Guide, Sundaram Ex. 39, at 5.[20] Fallon provides no support for the

---

**20.** The Employee Guide was applicable to all employees except for the members of the Sci-

plaintiff, indeed he undercuts the plaintiff's position, because he too lost his position as a result of the lack of funding for the mild gasification program. Hendrey Dep. 129; Petrakis Dep. 432–33; Steinberg Dep. 173–74; Melucci Aff. ¶ 30.

 Because the plaintiff has failed to meet his burden of demonstrating the existence of facts that raise an inference of discrimination in connection with his termination, the burden does not shift to the defendant to proffer a legitimate, non-discriminatory reason for its termination decision, *see, e.g., Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2nd Cir.2005), and summary judgment should be awarded without considering whether the defendant's reason for termination was pretextual. *Id.* at 90. Nevertheless, the court notes that the plaintiff has offered no evidence to demonstrate that the defendants' stated reason for termination—a lack of funding—was false. The record is absolutely undisputed that the plaintiff was advised, more than a year before his termination, that he was being given a one-year appointment, during which the plaintiff would be assigned to the Mild Gasification Program, and that the appointment would be "subject to renewal upon sufficient funding for this program in subsequent years." Sundaram Dep. Ex. 24. The record is also undisputed that funding for the Mild Gasification Program fell to $0 at the end of the year. Petrakis Dep. 90; Petrakis Aff., Ex. C; Sundaram Dep. 417. Thus, the prerequisite for continued employment—sufficient funding for the Mild Gasification Program—was clearly stated well in advance, and the prerequisite was not met. In the face of this evidence no reasonable juror could conclude that the defendants' reason for termination was a pretext for discrimination.

entific Staff and certain unionized workers.

*(ii) Denial of Tuition Reimbursement— August 1991*

There is no dispute that Brookhaven had a program for reimbursement of tuition expenses incurred by staff members, that the plaintiff incurred tuition expenses, and that his application for reimbursement of those expenses was not approved. The open questions, then, are whether the plaintiff has asserted facts giving rise to an inference of discrimination on the basis of race, color, national origin or age, and if so, whether material issues of fact surround the legitimacy of the defendants' explanation for their decision to deny reimbursement.

To establish his prima facie case, the plaintiff asserts a single fact to substantiate his contention that the denial of tuition was motivated by discriminatory animus, specifically, that all applications for tuition reimbursement by white employees in the DAS were approved. See Pl. Mem. in Opp. at 55–56. In support of that assertion the plaintiff points to a handful of applications by DAS employees in 1990 and 1991 which were apparently approved. See Pl. Attach. 7, at Tab "Tuition Refund." There is no testimony or other evidence in the record, however, concerning the race, color or national origin of any of the applicants. Nor, for that matter, is there any testimony or other evidence that the applications constitute all applications for tuition reimbursement filed by DAS employees, white or otherwise. The evidence therefore falls short of establishing the plaintiff's proposition.

The applications fall short of establishing an inference of discrimination in another material respect. As noted earlier, when seeking to make comparisons to similarly situated persons outside the protected class, the plaintiff must demonstrate

*See id.* at *i.*

that the comparators are "similarly situated in all material respects" to the plaintiff. *See, e.g., Graham v. Long Island R.R.*, 230 F.3d at 40. Examination of the applications submitted by the plaintiff reveals that every applicant sought tuition reimbursement for only three semester hours, whereas the plaintiff's application sought reimbursement for twelve semester hours. This distinction is material because the tuition reimbursement plan is limited to nine semester hours, unless special approval is received from a Department Chairman or Division Manager. See Supervisors' Personnel Manual, Melucci Dep. Ex. 68, Section 22 (at Bates No. 001917). Thus, the proper comparison is not with persons who submitted routine applications that did not require special approval, but rather with a person outside the protected class who, like the plaintiff, sought more than nine semester hours thus requiring special approval. No such comparator is offered by the plaintiff. The plaintiff's effort to raise an inference of discrimination by showing he was treated less favorably than a similarly situated white person fails for the simple reason that he has identified no such similarly situated white person. The plaintiff therefore fails to establish a prima facie case of discrimination on the basis of race, color or national origin in connection with his request for tuition reimbursement.[21]

(iii) *Harassment (national origin)*

■■■ The plaintiff's claim of harassment on the basis of national origin, also commonly known as a hostile work environment claim, requires a showing of harassment that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Feingold v. New York*, 366 F.3d 138, 149 (2nd Cir.2004)

(*quoting Alfano v. Costello*, 294 F.3d 365, 373 (2nd Cir.2002)). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Alfano v. Costello*, 294 F.3d at 373 (citing *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2nd Cir. 2001)). This showing has both objective and subjective elements. Thus, the harassment must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Unless very severe, an isolated act will not suffice to establish actionable harassment. *See, e.g., Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2nd Cir.1999). Accordingly, "[a]s a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d at 374 (citing *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2nd Cir.1997)) (internal quotation marks omitted). Finally, the plaintiff must demonstrate that the harassment occurred because of his membership in a protected class, here, national origin. *See, e.g., Brown v. Henderson*, 257 F.3d 246, 252 (2nd Cir.2001); *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 440 (2nd Cir.1999).

The plaintiff lumps together various employment decisions made by his supervisors and incidents that occurred during and after his employment as evidence of both harassment and retaliation. Pl. Mem. in Opp. at 63–67. His retaliation claim is considered separately below. As to the harassment claim, however, the

---

21. The plaintiff offered no evidence whatsoever to support an inference of age discrimination in connection with his application for tuition reimbursement.

proof he cites is utterly devoid of any evidence that the conduct about which he complains was motivated by discriminatory animus. He complains about being reassigned job duties, being required to give up his severance pay to continue working, being demoted from the Scientific Staff to the Professional Staff, being denied a pay raise for fiscal year 1991, being prevented from contacting funding agencies, being excluded from research planning meetings, asking for his resignation, and ransacking his office.[22] None of these incidents are tied, however, in any way to the plaintiff's national origin.

■ Indeed, combing the entire record, the court finds but two isolated statements made by others at Brookhaven related to the plaintiff's national origin. According to the plaintiff, in May 1990 Dr. Petrakis told him that he could "hire another Indian or a Chinese post doc for half the price that I'm paying you." Sundaram Dep. 406. Later, at some unspecified time in mid–1991, when the plaintiff asked Dr. Hendrey about his tuition reimbursement, the plaintiff says that Hendrey told him "you fucking Indians are a pain in the ass." Sundaram Dep. 430.[23] Although it is understandable that the plaintiff would consider the statement by Petrakis to be derogatory, the insult derives not from the plaintiff's na-

tional origin, but from the notion that he could easily be replaced at lesser expense. The statement attributed to Hendrey, on the other hand, is clearly obnoxious and utterly indefensible. By itself, however, or even in conjunction with the Petrakis statement made a year or more earlier, these statements do not suffice to establish a hostile workplace that is "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of ... employment were thereby altered." *Alfano v. Costello,* 294 F.3d at 373; *see Richardson v. New York State Dept. of Correctional Serv.,* 180 F.3d 426, 440 (2nd Cir.1999); *Citroner v. Progressive Cas. Ins. Co.,* 208 F.Supp.2d 328, 340 (E.D.N.Y.2002); *Curtis v. Airborne Freight Corp.,* 87 F.Supp.2d 234, 250–51 (S.D.N.Y.2000). Nor do these statements suggest that any of the other claimed incidents of harassment, even assuming they constitute harassment, were motivated by discriminatory animus based on national origin. Accordingly, the plaintiff's hostile work environment claim should be dismissed.

### (iv) Failure to Rehire after September 30, 1991 (race, color, national origin)

■ The plaintiff contends that he applied for a number of positions after his

---

**22.** The plaintiff's allegation that his office was ransacked stems from an incident in which the plaintiff's belongings were piled into a cart and moved from one office to another without his knowledge, and apparently with little regard for their value. Sundaram Dep. 490–93. This is the only incident for which no explanation is offered by the defendants. The plaintiff cites other incidents in his argument concerning retaliation and harassment, but since he learned about those matters during discovery and was unaware of them while he was still employed at Brookhaven, they do not constitute harassment leading to a hostile work environment.

**23.** In an affidavit submitted with the plaintiff's papers, the plaintiff appears to modify his testimony concerning the incident. He recounts the incident as follows:

> [Hendrey] called me "a pain in the ass." Regarding tuition refund, he asked me to the effect: "why you people are always looking for something free?" Hendrey also told me to the effect that BNL/AUI was not obligated "to educated me" before I was "kicked out of" the lab. Hendrey told me, in a vulgar manner, that Petrakis' sentiment was that the Lab need not educate me before being kicked out.

Sundaram Aff. ¶ 29.17.1, found in Pl. Attach. 3 at page 43.

termination and that he was not rehired for those positions because of his race, color and national origin. The plaintiff may establish a prima facie case of discrimination in the context of hiring decisions by showing he (1) belonged to a protected class, (2) applied for a position and was qualified to hold it, (3) was rejected, and (4) the position thereafter remained open and was ultimately given to a person outside the protected class. *See, e.g., St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 87 (2nd Cir.1996).

▮ The plaintiff asserts that he applied for the following positions at Brookhaven after it became clear that his position was being eliminated: Staff Engineer (vacancy # 8698); Staff Engineer (vacancy # 8135); Project Engineer (vacancy # 8126); Project Engineer (vacancy # 8621); Staff Engineer (vacancy # 8690); and Project Engineer (vacancy # DD 8693). Brookhaven asserts that it has no record that the plaintiff ever applied for any of those positions, but since it discards the applications of anyone who is not interviewed for the position and does not otherwise keep a record of those who submit applications, the court must assume for the purposes of this motion that the plaintiff did apply for the positions.[24] The plaintiff has also posited evidence that he was qualified for the above positions, although it is likely, as he himself notes, that he was probably "over-qualified" for the positions.

The plaintiff has also shown that the persons who filled the positions were outside the protected class of which he is a member. Thus, the plaintiff·has met his burden of establishing a prima facie case of discrimination.

▮ The plaintiff having met his burden, the defendant Brookhaven in turn has produced substantial evidence to meet its burden of articulating legitimate, non-discriminatory reasons for its hiring decisions. *See, e.g., St. Mary's Honor Center*, 509 U.S. at 507. Here, the defendant has submitted the affidavits of the persons who were involved in the hiring process for each of the hiring decisions at issue. See Kipperman Aff. ¶¶ 2–8; Sobrito Aff. ¶¶ 2–8; Dowling Aff. ¶¶ 1–11. The affidavits provide detailed explanations of the hiring processes used by the defendant, as well as the reasons for each of the hiring decisions. The affidavits unequivocally state that the defendant hired the most qualified person for each position. Kipperman Aff. ¶ 8; Sobrito Aff. ¶¶ 2, 7; Dowling Aff. ¶¶ 4, 7. Hiring the most qualified person for a position clearly constitutes a legitimate, non-discriminatory reason for the decision. *See, e.g., Scaria v. Rubin*, 117 F.3d 652, 654–55 (2nd Cir.1997)

▮ As the defendant has advanced legitimate, non-discriminatory reasons for its decisions, the presumption raised by the plaintiff's prima facie showing simply drops from the case, and the plaintiff bears the burden of showing that the reasons

---

24. Brookhaven also argues that the plaintiff's failure to rehire claims should be dismissed because his Second Amended Complaint failed to provide any facts concerning any of the applications upon which he now bases his claims, but rather only alleged generally that the defendant refused to rehire him. Such failure of specificity in a complaint concerning the dates of applications or the positions for which a plaintiff applied may well doom a complaint at the pleading stage. *See, e.g., Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2nd Cir.1998). But any ruling holding the complaint to be insufficiently precise would undoubtedly have permitted the plaintiff to replead to cure the defects. Now that discovery has been completed and there is ample specificity about the plaintiff's claims, amendment to conform to the evidence would be appropriate. *Cf.* Fed.R.Civ.P. 15(b).

advanced are false and that the plaintiff's race, color or national origin were the true reasons. *See, e.g., St. Mary's Honor Center,* 509 U.S. at 507–08 (citing *Burdine,* 450 U.S. at 255–56 & n. 10). It is here that the plaintiff's claims ultimately fail, because he produces no evidence that the defendant's reasons for its hiring decisions were false, nor does he produce evidence tending to show that the reasons offered were a pretext for discrimination, that is, that the plaintiff was not hired because of his race, color or national origin. The plaintiff seeks to quarrel with the decisions by pointing to his own qualifications in an effort to show how they match up with those of the person selected. Pl. LR 56.1 Counter–Stmt Appx, ¶¶ 26.16–26.17. This, however, does not demonstrate that the defendant's assertion that it hired the most qualified person is false. An employer is entitled to make value judgments in comparing the differing qualifications of various applicants. *See Scaria,* 117 F.3d at 654–55; *see also Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986) ("This Court does not sit as a super-personnel department that reexamines an entity's business decisions.") More importantly, the plaintiff proffers no evidence that the real reason he was not hired was his race, color or national origin. There is simply no evidence in the record that would tend to show that any of the persons who were involved in the hiring process for the six positions considered race, color or national origin in any way in making their recommendations concerning the applicants who were hired and those who were rejected. Indeed, for two of the positions—vacancy # NS 8126 and vacancy # DD 8690—Asian Indians were among the decisionmakers in the hiring process. Sobrito Aff. ¶ 7 & Ex. D (Achyut Tope); Dowling Aff. ¶ 4 & Ex. B (Jan Naidu). Finally, it is plain from the record that the defendant had a number of Asian Indian employees, including

the plaintiff, during and after the time when the plaintiff was employed at Brookhaven.

### 2. *The Claim of Retaliation*

 The plaintiff's retaliation claim is based on the allegation that the defendants refused to rehire the plaintiff after April 21, 1992 in retaliation for the filing of his Title VII charge. Claims of retaliation are subject to the same burden-shifting analysis as direct claims of discrimination. Thus, a plaintiff must first establish a prima facie case by showing that (1) he participated in a protected activity; (2) the defendant knew of the protected activity; (3) the plaintiff suffered an adverse employment action; and (4) there exists a causal connection between the protected activity and the adverse employment action. *McMenemy v. City of Rochester,* 241 F.3d 279, 282–83 (2nd Cir.2001). If the plaintiff meets his burden, it then falls to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2nd Cir. 2005). Assuming the employer meets that burden, the presumption of retaliation drops out of the picture and the plaintiff has the burden of proving that the proffered reason is false and that retaliation was a substantial reason for the employer's action. *Id.*

The protected activity that provides the basis for the plaintiff's claims of retaliation is the filing of his complaint of discrimination with the EEOC on April 21, 1992. Although the plaintiff complains generally that the defendant's failures to rehire him were motivated by retaliation, only one of the six failures to rehire identified by the plaintiff occurred after April 21, 1992, specifically, the staff engineer position identified as vacancy # LF 8135. As the five other positions for which the plaintiff

claims he applied were filled before April 21, 1992, those hiring decisions could not have been affected by the plaintiff's protected activity.

As for vacancy # LF 8135, that position was posted in April 17, 1992 and filled on June 2, 1992, about 6 weeks after the plaintiff filed his complaint of discrimination. As noted earlier, the plaintiff's only evidence that he applied for the position is his own statement unsupported by any documentation whatever. The defendant's records contain no evidence of any such application. Rather, the defendant's unrebutted evidence establishes that a Lisa Ficara was the "recruiter" for the position, who reviewed all applications and selected those to be forwarded for interviews. Kipperman Aff., ¶¶ 3, 8. The position was posted as "[e]ntry level position requiring B.S. in civil, environmental engineering, or related field." *Id.*, Ex. A. Thus, assuming the plaintiff had applied he would undoubtedly have been eliminated immediately as vastly over-qualified, given his Ph.D., and hardly a candidate for an entry level position, given his years of experience. The defendant's unrebutted evidence also describes the interviewing process, conducted by three individuals—A. Raphael, R. Howe, and R. Litcke—who rated the candidates, and made the decision concerning whom to hire. *Id.* ¶¶ 2–3, 6–8, & Exs. A, B. There is no evidence to indicate that either Ms. Ficara or any of the three interviewers had any knowledge of the plaintiff's EEOC complaint, and thus any motive to retaliate against the plaintiff. Indeed, there is no evidence that any of them ever had any interaction with the plaintiff or even knew who he was. In short, the plaintiff has failed to establish a prima facie case of retaliation because there is no evidence that any of the decisionmakers was aware of the plaintiff's protected activity and thus no evidence of a causal connection between the protected activity and the defendant's hiring decision.

### 3. The Implied Covenant of Good Faith and Fair Dealing

The plaintiff's claim for breach of the covenant of good faith and fair dealing fails for the simple reason that this implied obligation is not a basis for imposing liability, but rather is only a defense to liability when one is sued for breach of contract by another. New York law of course recognizes an implied covenant of good faith and fair dealing in every contract. *Travellers Intern., A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570 (2nd Cir.1994); *Leberman v. John Blair & Co.,* 880 F.2d 1555 (2nd Cir.1989); *Gelder Medical Group v. Webber,* 41 N.Y.2d 680, 394 N.Y.S.2d 867, 871, 363 N.E.2d 573 (1977) (citing *Van Valkenburgh, Nooger & Neville v. Hayden Pub. Co.,* 30 N.Y.2d 34, 330 N.Y.S.2d 329, 332–33, 281 N.E.2d 142, *cert. denied,* 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972); 10 N.Y. Jur., Contracts, § 203). Although the parties to a contract are bound by that implied duty, however, the duty does not create new contractual rights that are not enumerated in the express contract. *See Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2nd Cir. 1992); *Geler v. National Westminster Bank USA,* 770 F.Supp. 210, 215 (S.D.N.Y. 1991). Nor does the implied covenant provide an "independent basis for recovery." *Village on Canon v. Bankers Trust Co.,* 920 F.Supp. 520, 534–35 (S.D.N.Y.1996) ("[T]here is no independent claim for the breach of the duty of good faith and fair dealing."); *Quail Ridge Associates v. Chemical Bank,* 162 A.D.2d 917, 919, 558 N.Y.S.2d 655, 657 (3rd Dep't 1990). Rather, "it is a disqualifying factor as distinguished from a liability-imposing factor." *Quail Ridge Associates,* 162 A.D.2d at 919,

558 N.Y.S.2d 655 (quoting *Super Glue Corp. v. Avis Rent A Car System, Inc.,* 132 A.D.2d 604, 605–06, 517 N.Y.S.2d 764, 766 (2nd Dep't 1987))(internal quotations omitted). Put another way, a party may assert breach of the covenant as a defense to a contract claim made by another, much like the doctrine of unconscionability, but may not assert a breach of the covenant as an independent basis for imposing liability on another. The plaintiff's claims for breach of the implied covenant of good faith and fair dealing should therefore be dismissed.

### 4. *The ERISA Claim*

■ As pleaded in the complaint, the plaintiff's ERISA claim alleges a violation of 29 U.S.C. § 1140, and is based on the assertion that the defendant Brookhaven was motivated, in part, to discharge him in order to avoid the adverse economic impact that would occur if he was permitted to receive severance pay under the defendant's plan. See Second Amended Complaint, ¶ 50. The claim is argued, however, primarily as a claim under 29 U.S.C. § 1132 (although that section is not cited) for simply a denial of severance benefits to which the plaintiff contends he was entitled. Pl. Mem. in Opp. at 68–69. Regardless of theory, however, the claim fails because the plaintiff cannot prove he was denied any severance pay to which he was entitled.

The undisputed evidence establishes that the defendant was not entitled to severance pay when his employment at Brookhaven ended. Although the entire scope of the severance pay plan at Brookhaven is not set forth in the record, the plan provided severance pay when certain employees were laid off because of a reduction in force. D'Angio Dep. 60–61. Severance pay is not provided to all employees, however. According to the uncontroverted testimony of the Personnel Manager, Robert D'Angio, severance pay was not provided to term employees, that is, employees whose employment was for a specified period of time. *Id.* at 162, 517 N.Y.S.2d 764. When the plaintiff's employment at Brookhaven ended on September 30, 1991, he had just completed a one-year term appointment, the terms of which had been set forth in a memorandum addressed to the plaintiff dated September 27, 1990 which he acknowledged receiving in early October 1990. Sundaram Dep. Ex. 24; Sundaram Dep. 350. Under the terms of the plan, then, the plaintiff was not entitled to any severance pay.

In any event, the plaintiff had already received the benefit of any severance pay he may have accrued. Before his final one-year term appointment began, funding for the plaintiff had run out on several occasions. At one such point in January of 1990, before the plaintiff began serving that final term appointment, it appeared that the funding shortage would result in a layoff of the plaintiff. See discussion *supra* at 40–41. To forestall a layoff, the plaintiff agreed to accept a short-term appointment through the end of March 1990 which was to be funded in part by the severance pay to which he would have been entitled had he been terminated immediately. Sundaram Dep. Ex. 12. This arrangement would permit him to remain employed at the laboratory where he would be in a better position to obtain fresh funding to save his job. D'Angio Dep. 46, 50.

As it turned out, funding emerged from another source so that the plaintiff did not have to "work off" his severance pay at that point. Several months later, however, the funding crisis reemerged and the plaintiff agreed to accept a short-term appointment ending September 30, 1990 at which time he would be terminated without severance pay. The terms of the ap-

pointment are contained in a memorandum dated May 13, 1990 addressed to the plaintiff, which he countersigned to indicate his approval. Sundaram Dep. Ex. 20. This time, no other funding emerged and the plaintiff's entitlement to severance pay therefore ended with the conclusion of the term appointment on September 30, 1990.

### 5. Fraud

■ The plaintiff asserts in his Seventh Claim for Relief that the defendants "made knowing, false, and fraudulent misrepresentations to him," suggesting that he is also asserting a claim for common law fraud. "An action for fraud in New York requires (1) representation of a past or present fact, not one of future intention; (2) known by the speaker to be untrue at the time it was made; (3) made with an actual intent to deceive; and (4) which causes the person hearing the statement to rely on it and suffer injury as a consequence." *Economu v. Borg–Warner Corp.*, 652 F.Supp. 1242, 1249 (D.Conn. 1987) (citing *Galvez v. Local 804 Welfare Trust Fund*, 543 F.Supp. 316, 318 (E.D.N.Y.1982)). In addition the plaintiff must show pecuniary loss proximately caused by reliance on the misrepresentation. *Economu*, 652 F.Supp. at 1250.

The plaintiff testified that the misrepresentations to which he was referring concerned the defendant's intention to continue to name him as a principal investigator on the Mild Gasification Program and to permit him to work on Synchrotron Radiation. The defendant persuasively argues that the plaintiff's fraud claim cannot succeed because (1) it is based on alleged misrepresentations about future intentions, not past or present fact, (2) there is no evidence that the representations were made with the intent to deceive, (3) there is no evidence he relied to his detriment on those representations, and (4) there is no

evidence he suffered any pecuniary loss because of the representations. As the plaintiff points to no evidence concerning any of those matters and does not contest any of those arguments, any fraud claim that may have been pleaded should be dismissed.

### III. OTHER MOTIONS

Three other motions remain to be addressed. The plaintiff made a motion for partial summary judgment, and the plaintiff and the defendants have each made motions to strike portions of the record submitted by the other in connection with the summary judgment motions.

In view of the conclusion above that the defendants' motion for summary judgment should be granted, the plaintiff's motion for partial summary judgment should be denied.

■ As to the plaintiff's motion to strike portions of the record submitted by the defendants, the plaintiff seeks to strike various items of testimony and exhibits on the grounds that they were not based on personal knowledge, stated conclusions rather than facts, or were made by witnesses not competent to testify to the facts asserted. The court has examined the various portions of evidence attacked by the plaintiff and has determined that, to the extent the court has relied on any such evidence, the evidence was admissible under one or more exceptions to the hearsay rule, was proffered by a witness competent to testify about the facts asserted, and did not constitute conclusions of law but facts and reasonable inferences. Accordingly, the motion should be denied insofar as it attacks evidence relied on in this decision. As to the numerous other items of evidence attacked by the plaintiff, but which were not relied on by the court, the court need not rule and should decline to do so.

The defendants have moved to strike Attachment 4 of the materials submitted by the plaintiff. Attachment 4 constitutes all of the deposition testimony of the plaintiff, taken over three days, interlineated with numerous handwritten clarifications, corrections and additions, together with an errata sheet that catalogues the more than one thousand changes the plaintiff seeks to make to the testimony recorded by the court reporter. The defendants contend that the changes are untimely because they were not served on the defendants until almost three years after the deposition was taken, and therefore do not comply with Rule 30 of the Federal Rules of Civil Procedure.[25]

The plaintiff does not dispute that the changes were untimely. Rather he argues that they do not contradict his testimony, but merely clarify or amplify it. Thus, he argues it would be inappropriate to strike the entire Attachment, upon which he himself relies both in response to the defendants' motion and in support of his own.

 There is ample authority for the proposition that untimely deposition changes are to be disregarded, particularly where they have the effect of creating a disputed issue of fact. See, e.g., Margo v. Weiss, 213 F.3d 55, 60–61 & n. 3 (2nd Cir.2000); Qatar Nat'l Navig. & Transp. Co. v. Citibank, N.A., No. 89 Civ. 464(CSH), 1996 WL 601540, at *1 (S.D.N.Y. Oct. 18, 1996); Colvin v. Cigan Property and Cas. Co., No. 90 Civ. 3788(LJF), 1992 WL 122789, *2–3 (S.D.N.Y. May 22, 1992). That does not

mean, however, that the entire deposition should be stricken from the record as the defendants request. Rather, any changes made by the plaintiff to the transcript that have the effect of creating a disputed issue of fact should simply be disregarded in considering the summary judgment motions, and the court should rely on the original typescript of the court reporter.[26] The defendants' motion should therefore be granted in part to that extent, but denied insofar as it seeks to strike Attachment 4 from the record in its entirety.

## IV. CONCLUSION

For the foregoing reasons, I recommend

1. that the plaintiff's motion for partial summary judgment be denied;

2. that the defendants' motion for summary judgment be granted in its entirety resulting in the dismissal of the plaintiff's complaint;

3. that the plaintiff's motion to strike portions of the record be denied in part, and dismissed as moot in part; and

4. that the defendants' motion to strike portions of the record be granted in part and denied in part.

\* \* \* \* \* \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance

---

25. The applicable portion of Rule 30(e) provides,

> If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a

statement reciting such changes and the reasons given by the deponent for making them.

26. The court has examined all of the portions of the plaintiff's deposition cited in this opinion and find none that contain changes which create a material issue of fact.

588

on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *see, e.g., Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2nd Cir.1993); *Frank v. Johnson,* 968 F.2d 298 (2nd Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Serv.,* 892 F.2d 15, 16 (2nd Cir.1989) (per curiam).

### APPENDIX: LIST OF PAPERS SUBMITTED ON MOTIONS

*Plaintiff's Papers:*

1. Plaintiff Dr. Muthu S. Sundaram's Motion for Summary Judgment Pursuant to F.R.C.P. 56 (Dec. 28, 2000)

2. Plaintiff Dr. Sundaram's Memorandum of Law in Support of His Motion for Summary Judgment (Nov. 9, 2000)

3. Plaintiff Dr. Sundaram's Statements Pursuant to E.D.N.Y. Rule 56.1 in Support of His Motion for Summary Judgment (Nov. 9, 2000)

4. Plaintiff Dr. Sundaram's Reply Memorandum of Law in Support of His Motion for Summary Judgment (Apr. 17, 2001)

5. Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Nov. 30, 2000) ("Pl. Mem. in Opp.")

6. Plaintiff Dr. Sundaram's Response to Defendants' Rule 56.1 Statements (Nov. 30, 2000)

7. (A) Plaintiff Dr. Sundaram's Genuine & Contested Issues of Material Facts Pursuant to E.D.N.Y. Local Rule 56.1 (Nov. 30, 2000) ("Pl. LR 56.1 Counter-Stmt")

(B) Appendix of Plaintiff's Evidence in Response to Defendants' L.R. 56.1 Statement of Material Facts (Nov. 30, 2000) (Bound with Pl. LR 56.1 Counter-Stmt) ("Pl. LR 56.1 Counter-Stmt Appx")

8. Attachment 1: Pleadings, Admissions, Answers to Interrogatories & Responses to Requests for Production of Documents

9. Attachment 2: Affidavits

10. Attachment 3: Excerpts From the Depositions of the Defendants, Their Agents & Other Officers ("Pl.Attach.3")

11. Attachment 4: Deposition of Plaintiff Dr. Sundaram (Including Affidavit & Corrections Table) ("Pl.Attach.4")

12. Attachment 6: Documents Marked as Exhibits to Depositions ("Pl.Attach.6")

Vol. 1: [E:0001]—[E:0768]
Vol. 2: [E:0769]—[E:1557]
Vol. 3: [E:1558]—[E:2198]
Vol. 4: [E:2199]—[E:2700]
Vol. 5: [E:2701]—[E:3509]

13. Attachment 7: Supplemental Evidence in Support of Plaintiff's Motion & in Opposition to Defendants' Motion ("Pl.Attach.7")

14. Attachment 8: Chronology of Events

15. Attachment 9: Disputed Issues Marked in Defendants' L.R. 56.1 Statement

16. Objections To and Motion to Strike Defendants' Inadmissible Evidentiary Materials (Nov. 30, 2000)

17. Dr. Muthu S. Sundaram's Reply in Support of His Motion to Strike Defendants' Inadmissible Evidentiary Materials (June 11, 2001)

18. Dr. Muthu S. Sundaram's Response in Opposition to Defendants' Motion to Strike Plaintiff's Attachment # 4 (June 11, 2001)

*Defendants' Papers:*

19. Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment (Feb. 26, 2001)

20. Defendants' Local Civil Rule 56.1 Counter–Statement of Material Facts As To Which There Is a Genuine Issue To Be Tried (Feb. 26, 2001)

21. Affidavit of Edward Cerasia II, Esq. in Opposition to Plaintiff's Motion for Partial Summary Judgment (Feb. 27, 2001)

22. Defendants' Notice of Motion and Local Civil Rule 56.1 Statement of Material Facts as to Which There Is No Genuine Issue To Be Tried (Sep. 28, 2000) ("Def. LR 56.1 Stmt")

23. Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment (Sep. 28, 2000) ("Def. Mem. in Supp.")

24. Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment (Jan. 4, 2001) ("Def. Reply Mem.")

25. Affidavit of Edward Cerasia II, Esq.

26. Supplemental Affidavit of Edward Cerasia II, Esq.

27. Affidavit of Dr. Seymour Baron

28. Affidavit of Robert D'Angio

29. Affidavit of Donna Dowling ("Dowling Aff.")

30. Affidavit of Michael M. Goldman, Esq. ("Goldman Aff.")

31. Affidavit of Peter Alan Holland ("Holland Aff.")

32. Affidavit of Marsha Kipperman ("Kipperman Aff.")

33. Affidavit of Dr. Kelvin G. Lynn

34. Affidavit of Richard Melucci

35. Affidavit of David Owens

36. Affidavit of Dr. Leon Petrakis ("Petrakis Aff.")

37. Affidavit of Leo J. Salerno

38. Affidavit of Nancy Sobrito ("Sobrito Aff.")

39. Appendix of Evidentiary Exhibits in Support of Defendants' Motion for Summary Judgment—Volume One of Two (Exhibits A and B) ("Def. Appx Vol. I")

40. Appendix of Evidentiary Exhibits in Support of Defendants' Motion for Summary Judgment—Volume Two of Two (Exhibits C through W) ("Def. Appx Vol. II")

41. Notice of Motion and Affidavit of Edward Cerasia II, Esq. in Support of Defendants' Motion To Strike Attachment 4 (Feb. 26, 2001)

42. Defendants' Memorandum of Law in Support of Defendants' Motion To Strike Attachment 4 (Feb. 26, 2001)

43. Defendants' Memorandum of Law in Opposition to Plaintiff's Motion To Strike Certain of Defendants' Summary Judgment Materials (Mar. 12, 2001)

44. Affidavit of Edward Cerasia II, Esq. in Opposition to Plaintiff's Motion To Strike (Mar. 12, 2001)